FAIRBROOK LEASING, INC., et al.

v.

MESABA AVIATION, INC.

No. 02CV3816JMRFLN.

United States District Court,
D. Minnesota.

Dec. 8, 2003.

 

Brooks F. Poley, Winthrop & Weinstine, Minneapolis, MN, Kenneth A. Prine, Monticello, MN, for plaintiffs/counter–defendants.

Jeffrey A. Eyres, David M. Jaffe, Julie E. Sivula, Minneapolis, MN, for defendant/counter–claimant.

## ORDER

ROSENBAUM, Chief Judge.

This matter is before the Court on cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion is granted and denied in part; defendant's motion is denied.

## I. *Background*

Plaintiffs Fairbrook Leasing, Inc. ("FLI"), Lambert Leasing, Inc. ("LLI"), and Swedish Aircraft Holdings AB ("Swedish Holdings") lease aircraft. Defendant, Mesaba Aviation, Inc. ("Mesaba"), operates a regional airline under an airline services agreement ("code-sharing agreement") with Northwest Airlines ("Northwest"). In the course of that business, Mesaba leased Saab aircraft through FLI, LLI, and Swedish Holdings.

Between 1996 and 1998, plaintiffs delivered 23 Saab 340A airplanes to Mesaba, which operated the planes and made monthly lease payments through 2002. The parties dispute the duration and terms of the agreement under which Mesaba operated the aircraft.

According to plaintiffs, a "Term Sheet Proposal for the Acquisition of Saab 340 Aircraft by Mesaba Aviation, Inc.," ("Term Sheet") constitutes an enforceable lease for terms ranging from 72 to 96 months, with a provision for an extension of up to four years at FLI's option. Mesaba denies the Term Sheet is binding, and claims it is only obligated to the terms of certain individual short-term leases.

### A. *The Term Sheet*

Mesaba needed aircraft to fulfill its pending code-sharing agreement with Northwest. To obtain the planes, Mesaba issued a Request for Proposal ("RFP") in August, 1995. The RFP sought to evaluate aircraft for Mesaba's fleet in the next decade. Plaintiffs responded to the RFP with a series of proposals offering to provide both new Saab 340B+ and used Saab 340A aircraft.

On March 7, 1996, Mesaba, FLI, and Saab Aircraft of America, Inc. ("SAAI"), executed the Term Sheet, which described the sale of new 340B+ aircraft from SAAI, and the lease of used 340A aircraft from FLI. The aircraft are included in a summary section on the document's first page. The leasing transaction is summarized as follows:

> FLI proposes to sublease twenty (20) 340A Aircraft to Mesaba, subject to existing subleases. Mesaba will also acquire options for twelve (12) Option 340A Aircraft.

(Term Sheet at 1).

The 20 used Saab 340A planes are described as "firm," rather than "option," aircraft. *Id.* The Term Sheet's section concerning the 340A aircraft contains subsections entitled "Documentation," "Commitments of FLI and Mesaba," "Specifications," "Delivery Schedule," "Delivery Location," "Term of Subleases," "Basic Rent," and "Option 340A aircraft."

Under "Documentation," the Term Sheet specifies that "[t]he primary agreement is the Financing Agreement," and that the remaining sections pertaining to the leased aircraft are a "summary of selected elements of the Financing Agreement that apply to 340A Aircraft and Option 340A Aircraft." The Term Sheet clearly contemplates individual long-term subleases for each aircraft. (Term Sheet at 6.) Notwithstanding this provision, the parties never signed the Financing Agreement, and ultimately, executed only one long-term lease for a single aircraft.

Under "Commitments of FLI and Mesaba," the Term Sheet provides:

> As more fully described in Sections 3(a) and 4 [of the Financing Agreement], FLI shall deliver to Mesaba, and Mesaba shall sublease from FLI, twenty (20) 340A Aircraft, and Mesaba will pay, upon the signing of this Term Sheet, $25,000 per 340A Aircraft, for a total of $500,000 in Advance Payments.

(Term Sheet at 6.)

The section entitled "Term of Subleases" provides:

> At FLI's option, and depending on the remaining term of the applicable Head Lease, the term of each Sublease will be between 72 and 96 months (Section 5(a)(ii)), with best efforts to obtain four (4), one (1) year extensions at the same Basic Rent.

(Term Sheet at 7.) The Term Sheet sets the Basic Rent as $44,000 per aircraft, per month.

The Term Sheet outlines a delivery schedule which is "[t]o be determined, based on the provisions of Annex 1." This section, in turn, provides an overall window for delivery and a specified number of aircraft deliveries each month, with the mix of new and used aircraft to be determined by SAAI. The airplanes are to be delivered "at the facility where each Aircraft has been refurbished or another, mutually agreed location so as to minimize the tax impact of such delivery." The Term Sheet allows Mesaba to assign certain rights to Northwest, including the "right to acquire as yet undelivered 340A Aircraft" in the event the code-sharing agreement was not renewed before March 31, 1997. (Term Sheet at 7–8.)

The Term Sheet includes a section entitled "Conditions Precedent and Effect of

This Term Sheet," which lists conditions precedent to the anticipated formal documentation, including the Financing Agreement, and defines the validity of the Term Sheet itself. A subsection entitled "Effect of this Term Sheet" provides:

> By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996; provided, however, that in the event of any conflict between the terms set forth in this Term Sheet and any such draft, the terms set forth in this Term Sheet shall prevail.

(Term Sheet at 10.)

The Term Sheet states that it "is to be governed in all respects" by New York law, "including all matters of construction, validity and performance." *Id.*

Finally, the Term Sheet provides that it "shall not be effective unless and until . . . it has been signed and delivered to each other party," and SAAI and FLI have received specified partial payment. The Term Sheet requires approval by the Board of Directors of SAAI, FLI, and Mesaba. (Term Sheet at 10–11.) The parties agree all conditions precedent to effectuating the Term Sheet have been fulfilled.

### B. *Subsequent Negotiations*

The parties agreed to modify the Term Sheet as a result of Northwest's influence. As part of the modification, FLI agreed to a $13,000 monthly rent rebate from the Term Sheet's $44,000 rent. (Eyres Aff., Ex. C.) Although the Term Sheet contemplated each aircraft being leased through FLI, Mesaba bypassed FLI and leased

several planes from companies not party to the Term Sheet—plaintiffs LLI and Swedish Holdings. Instead of using Saab's standard form sublease, the parties negotiated based on Northwest's standard form. (Term Sheet at 6; Deposition of Henrik Schroder, January 8, 2003, at 127–28.)

### C. *Aircraft Delivery*

In May, 1996, while negotiations on final documents continued, FLI began to deliver the 340A aircraft.[1] In another departure from the Term Sheet, the parties executed short-term subleases ranging from 2 to 3 months for each aircraft, instead of the long-term sublease of 72 to 96 months. Some of these short-term subleases contained a form of integration clause. All but one acknowledged their status as "interim" leases, and stated an agreement on a longer-term lease was "pending." None of the subleases referenced the Term Sheet. The parties continued to negotiate, but were ultimately able to conclude only one long-term aircraft lease calling for a term of 96 months. (Eyres Aff., Ex. Q1, at 003007.)

Mesaba made a 10–Q filing before the Securities and Exchange Commission for the quarter ending June 30, 1996. The filing reported delivery of 4 used Saab 340A aircraft, and stated Mesaba "had agreed to acquire 30 new Saab 340B Plus and 20 used Saab 340A aircraft." (Second Poley Aff., Ex. H.)

The Term Sheet called for an April 15, 1996, deadline, at which time the parties were to deliver definitive documentation. This deadline was extended in writing several times, but finally expired on August 30, 1996. Notwithstanding the absence of a finalized agreement, plaintiffs continued

---

1. In fact, the first 4 aircraft delivered in May, 1996, were from LLI. A contemporaneous letter from Saab AB to Mesaba expressly references both the interim lease between LLI and Mesaba, and the Financing Agreement to be executed by Mesaba, SAAI, and FLI. (Eyres Aff., Ex. C.)

to deliver—and Mesaba continued to accept—planes under short-term leases.[2] These leases were extended by agreement several times.

The parties continued to negotiate the terms of long-term leases throughout 1996 and 1997. Mesaba's amended 1996 10–K identified the Term Sheet among its "material contracts" as Exhibit 10–U. The Term Sheet has been noted, by reference, in each of Mesaba's subsequent 10–K reports. (Second Poley Aff., Ex. J–L.)

On July 1, 1997, Mesaba and Northwest executed a new ten-year code-sharing agreement that referenced the Term Sheet and stated:

> [W]ith respect to Saab 340A Aircraft, the term of each sublease shall be for a period ending on the earlier of the Termination Date [of the Code-sharing Agreement, i.e., July 1, 2007] or the date which corresponds with the 17th year of life of an Aircraft subject to this Sublease; provided, however, no Sublease shall be for a term longer than the term of the applicable head lease.

(Second Poley Aff., Ex. M.) The code-sharing agreement further provided that the monthly rent for each 340A aircraft should not exceed $31,000. *Id.*

### D. *Saab's Announcement*

In December, 1997, Saab announced it would cease manufacturing the 340 model commercial aircraft, prompting Mesaba's concern that the cost of repair and maintenance might increase. This led to further negotiations with FLI. Mesaba's then-president and former general counsel testified that they used the long-term lease negotiations as leverage in an attempt to obtain what Mesaba characterized as a "maintenance cost guarantee" and plaintiffs called a "customer support agreement." (Deposition of Bryan K. Bedford, February 20, 2003, at 47–50; Deposition of John S. Fredericksen, January 16, 2003, at 63–64, 66.)

Even after Saab's announcement, plaintiffs continued to deliver, and Mesaba accepted delivery of, Saab 340A aircraft. Mesaba's 10–K report for the year ending March 31, 1998, states:

> In March, 1996, Mesaba entered into an agreement with Saab Aircraft of America, Inc. ("Saab") for the acquisition of 30 new Saab 340B Plus aircraft and 20 used 340A aircraft. As of March 31, 1998, all of the aircraft covered by this agreement had been delivered. The Company also exercised its option agreement for 19 additional new Saab 340B Plus aircraft and three additional used Saab 340A aircraft.

(Second Poley Aff., Ex. I.)

Despite requests from FLI, Mesaba refused to sign long-term leases for the 340A aircraft. Negotiations ultimately ceased in December, 1998. (Fredericksen Dep. 63–64.) Mesaba has continued to operate the 23 Saab 340A aircraft throughout 1998, 1999, 2000, and 2001, and continued its lease payments of $31,000 per aircraft per month. In March, 2001, Mesaba waived FLI's obligation to seek four one-year extensions for the first three aircraft whose head leases were set to expire in December 2001. (Eyres Aff. Ex. P, Second Poley Aff. Ex. P.)

### E. *The Current Dispute*

In 2001, Mesaba declared it would begin to return some of the leased aircraft. FLI

---

**2.** LLI is a party to four leases, each dated May 15, 1996 (Eyres Aff., Ex. Q11–12, 17–18.) First Security Bank, N.A., as trustee for Saab Aircraft Credit AB, is a party to five leases dated October, 1997, through March, 1998 (Eyres Aff., Ex. Q1–5); these constitute direct leases from Swedish Holdings. FLI is a party to the remaining fourteen leases, dated June, 1996, through June, 1998. (Eyres Aff., Ex. Q6–10, 13–16, 19–23.)

protested that the aircrafts' lease duration, as established under the Term Sheet, had not expired. On July 9, 2002, Mesaba argued it was bound by only the individual short-term leases, and once those expired, it could return the aircraft at any time. In October, 2002, Mesaba ceased making lease payments for several of the Saab 340A aircraft. This action ensued.

## II. Analysis

### A. Summary Judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Hartnagel v. Norman*, 953 F.2d 394, 395–96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (Emphasis omitted.) *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

When the matter before the Court is a question of contract, if the intent of the parties can be determined from written documents, the question of whether a bind-ing contract exists is a matter of law appropriately determined on summary judgment. *See Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989); *see also Four Seasons Hotels Ltd. v. Vinnik*, 127 A.D.2d 310, 515 N.Y.S.2d 1, 6 (1st Dep't 1987).

### B. Is the Term Sheet Binding?

Under New York law, a preliminary agreement will not ordinarily bind parties who contemplate further negotiation and the execution of a formal instrument. *Adjustrite Systems, Inc. v. Gab Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998). Notwithstanding this general principle, preliminary agreements may be found binding in appropriate circumstances. *Id.*

New York law recognizes two types of binding preliminary agreements. The first, ("Type I"), arises when the parties agree on "all the points that require negotiation" and is preliminary only as to form. The parties have the right to demand performance of the transaction. *Id.* The second, ("Type II"), establishes a framework for agreement, and binds the parties to negotiate in good faith within that framework. The parties are free to walk away once they have "made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." *See id.*, citing *Teachers Ins. and Annuity Assn. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987) (*Tribune*). Here, the parties have addressed both Type I and Type II theories, and the Court considers both theories.

In each type of agreement, as in most contract cases, the parties' intent determines whether they are bound and to what extent. *Adjustrite*, 145 F.3d at 548–49. "To discern that intent a court must look to the 'words and deeds [of the parties]

which constitute objective signs in a given set of circumstances.'" *Id.*, citing *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir.1985) (alteration in original). Subjective evidence of intent is usually not considered. *Adjustrite*, 145 F.3d at 549, citing *Rule v. Brine, Inc.*, 85 F.3d 1002, 1010 (2d Cir.1996).

■ To assess whether the parties have demonstrated an intent to be bound by a Type I agreement, a court considers (1) the language of the agreement; (2) the existence of open terms; (3) whether there has been partial performance; and (4) whether the agreement is of the type usually committed to writing. *Arcadian*, 884 F.2d at 72. For a Type II agreement, a court considers the same four factors, plus a fifth—the context of the negotiations resulting in the preliminary agreement. *Adjustrite*, 145 F.3d at 549, n. 6. Here, the Court examines each factor in turn.

### C. *Is there a Type I agreement?*

#### 1. *The language of the agreement*

■ The agreement's language is "the most important" factor. *Adjustrite*, 145 F.3d at 549, citing *Arcadian*, 884 F.2d at 72. "'There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.'" *Arcadian*, 884 F.2d at 73, quoting *Tribune*, 670 F.Supp. at 499.

■ Language expressing an intent to be bound at a later point supports the presumption. *See Adjustrite*, 145 F.3d at 550 (no binding agreement where language expressly contingent "'upon the execution of a sales agreement contract'"); *Arcadian*, 884 F.2d at 72–73 (no binding agreement where language referred to a future binding agreement and expressly contemplated that negotiations might fail); *Kreiss v. McCown De Leeuw & Co.*, 37 F.Supp.2d 294, 300 (S.D.N.Y.1999) (no binding agree-

ment where language states "[i]t is understood that this letter shall not be deemed to be self-executing, and that the parties' respective legal obligations ... shall arise solely from definitive documents to be entered into"); *In re Mizlou Commun. Co.*, 1993 WL 36158, *6 (S.D.N.Y.1993) (no binding agreement where language states "the terms hereof shall have no force and effect until definitive documentation containing such terms is executed").

Language which acknowledges that the parties have not yet reached an agreement also supports the presumption that the parties do not intend to be bound. *See Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F.Supp.2d 249, 255 (S.D.N.Y.) ("[w]e are looking forward to entering detailed commercial discussions as soon as practicable"), *aff'd*, 242 F.3d 365, 2000 WL 1804502 (2d Cir.2000). Additional support for the presumption may come from agreement language that is incomplete or missing key terms. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 71–72 (2d Cir.1984) (no binding agreement where blank spaces in standard form franchise agreement had not been filled in with key provisions concerning development schedule and franchise territory).

Applying these principles here, the Court finds the Term Sheet's language indicates the parties have reached a Type I agreement. The Term Sheet's length, detail, formality, and completeness lends support to the finding that this document defines the parties' obligations, and is not a mere invitation for them to continue to negotiate. The Term Sheet unambiguously states that, "By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation ...." This language does not indicate a qualification or hesitation concerning the existence

of an agreement; it merely indicates that scrivener work—"definitive documentation"—remains to be done. The Term Sheet's language explicitly resolves future issues which may arise as the conforming documents are drafted. It does so by specifying that in the event of a conflict between the Term Sheet's terms and any subsequent drafts, the Term Sheet's terms "shall prevail."

It is also appropriate to note that the CEOs of Mesaba and FLI each initialed the first ten pages of the Term Sheet, and all executed it on the last page. In doing so, they agreed the Term Sheet would be governed by New York law in matters of "construction, validity *and performance*" (emphasis added); and that its effectiveness depended upon five listed conditions precedent, all of which were fulfilled.

The Court recognizes that the Term Sheet also calls for additional conditions precedent to the formal documentation, including the Financing Agreement. But the parties carefully avoided making the Term Sheet effective on the execution of formal documentation. *Contrast, e.g., Adjustrite*, 145 F.3d at 549–50. Indeed, the Term Sheet provides that Mesaba's obligation to pay FLI $500,000 arose "upon the execution of this Term Sheet," and that FLI's obligation to deliver planes began in May, 1996. (Term Sheet at 2, and Annex 1.) As a result, neither party's performance was contingent on further or formal documentation. The Court does not consider it trivial that even though a final document was never created, the parties actively engaged in millions of dollars of aircraft delivery and lease payments for those planes.

Finally, although the Term Sheet sets a deadline for drafting formal documents and acknowledges the possibility that Mesaba's code-sharing agreement with Northwest might not be completed, the Term Sheet never suggests the parties have not closed their deal. *Contrast Arcadian*, 884 F.2d at 70 (providing for repayment of capital expenditures and refund of buyer's deposit if negotiations failed); *Ogden Martin Systems of Tulsa, Inc. v. Tri–Contl. Leasing Corp.*, 734 F.Supp. 1057, 1068 (S.D.N.Y.1990) (providing for reimbursement of expenses should the transaction fail to close).

The Term Sheet language demonstrates the parties' completion of a Type I agreement.

## 2. *The existence of open terms*

■ The presence of open terms, especially when there remain ongoing negotiations, suggests the parties do not intend to be bound. *See Winston*, 777 F.2d at 82–83; *Spencer Trask Software and Info. Servs. LLC v. RPost Intl. Ltd.*, 2003 WL 169801, *9 (S.D.N.Y.2003). This suggestion can be overcome when the open terms are insignificant to the parties, *see Shann*, 84 F.3d at 77–78 (2d Cir.1996), or when all essential terms have been agreed upon, *see Tribune*, 670 F.Supp. at 501.

■ Here, Mesaba suggests the Term Sheet is missing customary aircraft lease terms, for example, insurance and maintenance obligation, aircraft identifiers, delivery dates, and delivery places. FLI replies that the Term Sheet does not purport to be an aircraft lease, and that many of the "open" terms are either determinable or have already been determined by the parties, for example, all specified aircraft have been delivered and accepted.

The Court considers Mesaba's objections on this ground to be cavils. The Term Sheet sets out a commitment to obtain described aircraft. Certainly each plane has a serial number, but the Term Sheet's failure to recite those numbers does not change Mesaba's commitment to obtain the planes. Other than the inconsequential absence of a stated delivery location,

there is no indication that either party has ever had the slightest complaint about the date, timing, or place of delivery. The monthly lease rate was not only established, but was satisfactorily modified by the parties' subsequent agreement. The parties have treated this as a completed contract—because it was.

### 3. *Partial performance*

██ Partial performance is "an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group*, 751 F.2d at 75–76. The parties' performance and expressions of intent can establish a binding agreement even in the absence of a written contract. *See V'Soske v. Barwick*, 404 F.2d 495, 499–500 (2d Cir.1968). However, it is clear that even substantial partial performance creates no binding agreement where the parties otherwise do not intend to be bound. *Adjustrite*, 145 F.3d at 550 (plaintiffs performed under preliminary agreement for six months; no enforceable agreement); *Missigman v. USI Northeast, Inc.*, 131 F.Supp.2d 495, 510 (S.D.N.Y. 2001) (plaintiff substantially performed obligations of preliminary agreement and worked for defendant for two years; no enforceable agreement).

It is black letter law that partial performance requires "some actual performance of the contract, such that the plaintiffs must have conferred something of value upon the defendants which the defendants accepted." *Spencer Trask Software*, 2003 WL 169801 at *9 (citation omitted). Partial performance is "most persuasive when ... of a type that the performing party would be unlikely to render without the assurance of a binding contract[,]" for example when the performance cannot be easily undone. *Henchman's Leasing Corp. v. Condren*, 1989 WL 11440, *4 (S.D.N.Y.1989).

The Court finds this factor strongly supports the conclusion that the Term Sheet is a binding contract. Plaintiffs delivered, and defendant paid for, 23 aircraft, even in the absence of final documents. This occurred using only the Term Sheet. The parties' performance continued, even recognizing that other collateral matters might remain. These aircraft were unquestionably of benefit to Mesaba, constituting as they did an essential part of its fleet.

### 4. *Are written agreements customary?*

Certainly, this case and the parties' disagreement would be easier to resolve if each of the contemplated documents had been drafted and exchanged. Of course, had that occurred, this case might never have arisen. This observation does not, however, undermine the agreement.

This case arises not in the context of a law school examination, but in the real world. Plaintiffs had airplanes for sale and lease, and Mesaba needed those planes to transport its customers. When the costs of obtaining and maintaining those planes were too high, the parties renegotiated the lease rate. When the parties found it more convenient for Mesaba to lease planes from LLI and Swedish Holdings, they agreed to do so. It is clear to the Court that the parties found having planes in Mesaba's hands, and plaintiffs receiving a cash flow, to be more important than having a bunch of written documents.

In a perfect world, the final documents would have been exchanged and signed, but neither the parties nor this Court occupy that world. This does not mean the parties did not have a contract; they did— the Term Sheet.

### D. *Is There a Type II Agreement?*

▮ Even assuming there is no Type I agreement, the Term Sheet satisfies the requirements of a Type II agreement. The factors above, plus the overall context of negotiations, favor a conclusion that Mesaba and FLI bound themselves at a minimum to a framework within which to negotiate open terms in good faith.

The Term Sheet is explicit: "By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation in substantially the form" of earlier drafts. (Term Sheet at 10.) Because the Term Sheet language controls subsequent drafts, the framework is clear—the parties were to negotiate long-term leases for at least the 20 "firm" used Saab 340A airplanes. A Type II agreement arises "when the parties agree on certain major terms, but leave other terms open for negotiation." *See Adjustrite*, 145 F.3d at 548; *Tribune*, 670 F.Supp. at 501 (finding Type II agreement where two page term sheet "covered the important economic terms of a loan"). As described above, the Term Sheet reflects agreement on all "major terms" of a lease: the identity of lessor and lessee, the number of planes, the rent for each, the configuration of each plane, the delivery schedule, and the lease term. Here, FLI and Mesaba performed the major terms as they continued to negotiate the minor ones.

The overall context of the negotiations supports a conclusion that a Type II agreement existed. Mesaba needed planes to fulfill its route obligations under a ten-year Northwest code-sharing agreement which was up for renewal in the summer of 1997. All of Mesaba's business derives from this code-sharing agreement, and presumably, it would have been of some concern to Northwest if Mesaba did not have enough planes to ·fly its routes. Yet the record does not reflect that Mesaba either had, or was pursuing, any other long-term contracts to supply Saab 340A planes in 1997. *Compare Tribune*, 670 F.Supp. at 500 (negotiation context supported finding Type II agreement between borrower and lender where borrower needed lender's firm commitment to satisfy its obligations in a transaction with third party). Like the borrower in *Tribune*, Mesaba needed plaintiffs' performance to fulfill its obligations.

Saab's December, 1997, announcement that it was ceasing to manufacture these aircraft may have shifted the negotiations, but did not affect the parties' obligations outside the Term Sheet framework. Changed circumstances may make a deal less attractive to one side than it was at the time of the initial agreement, but courts will hold the parties to their bargain. *Compare Tribune*, 670 F.Supp. at 501 ("Teachers would not have been free to walk away from the loan by reason of a subsequent decision that the transaction was not in Teachers' interest. Nor could Tribune."); *Teachers Ins. and Annuity Assn. v. Ormesa Geothermal*, 791 F.Supp. 401, 405 (S.D.N.Y.1991); *Teachers Ins. and Annuity Assn. v. Butler*, 626 F.Supp. 1229, 1232 (S.D.N.Y.1986). Here, Mesaba saw an opportunity to address its changed economic priorities by insisting on changes in its agreement with FLI, and obtained a benefit in the form of reduced monthly payments with assurances of continued maintenance and parts (the "maintenance cost guarantee" or "customer support agreement"). In signing the Term Sheet, Mesaba agreed to execute, or at the very least to negotiate in good faith, long-term leases for each airplane. Mesaba's refusal to continue negotiating long-term leases may not involve subjective bad faith, but nonetheless, constitutes a breach of its obligations under the Term Sheet.

Plaintiffs' action to enforce the parties' Type II agreement is not barred by limitations. Although Mesaba correctly notes that a breach of contract claim accrues at the time of the breach, *Raine v. RKO General, Inc.,* 138 F.3d 90, 93 (2d Cir. 1998), the Court does not consider the expiration of the August 30, 1996, deadline for "definitive documentation" to be a breach of the Term Sheet's obligation to negotiate. The Term Sheet provides no method for extending or enforcing the deadline, and no consequences if the deadline is missed. *Contrast Ormesa,* 791 F.Supp. at 411 (commitment letter provides that it expires at deadline unless extended by lender in writing); *G.P. Putnam's Sons v. Owens,* 51 A.D.2d 527, 378 N.Y.S.2d 637, 638 (1st Dep't 1976) (agreement gives publisher option to terminate contract if author does not deliver manuscript by deadline).

The parties clearly agreed in writing to extend their deadline three times in 1996, and when the last extension expired, they simply continued to negotiate without pursuing another written extension. "When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old." *Martin v. Campanaro,* 156 F.2d 127, 129 (2d Cir.1946). It is undisputed that on October 2, 1996, six years before this action was filed, the parties were performing their obligations under the Term Sheet, including their obligation to negotiate definitive documentation. They continued to negotiate for another two years.

The Court finds plaintiffs' claims related to Type II obligations under the Term Sheet timely.

### E. Is the Term Sheet Superseded by the Short-term Leases?

██ "When the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished[.]" *Health–Chem Corp. v. Baker,* 915 F.2d 805, 811 (2d Cir.1990). Here again, the parties' intention controls. *Dickinson v. Vance,* 31 A.D. 464, 53 N.Y.S. 619, 621 (4th Dep't 1898). In this regard, Mesaba argues that the individual short-term leases' integration clauses reflect the parties' intent to replace the Term Sheet with the short-term individual leases. FLI replies that the short-term leases were mere "placeholders," allowing the aircraft to be delivered and operated pending agreement on the form of long-term leases.

The Court finds FLI's interpretation to be consistent with both the language of the documents and the context of the transaction. Twelve of the 22 short-term leases have no integration clause whatsoever. (Q6–10, 13–14, 16, 19–22.) The integration clauses in the others are general,[3] and do not expressly provide that the lease supersedes the Term Sheet. *Contrast Kindler v. Newsweek, Inc.,* 277 A.D.2d 159, 717 N.Y.S.2d 56, 56 (1st Dep't 2000) (party's reliance on prior agreement unjustified when new contract expressly states it supersedes the old). Moreover, virtually all[4] of the short-term leases which contain in-

---

**3.** As examples, various integration clauses read: "This Lease, including all schedules and appendices, constitutes the entire agreement between the parties" (Q1–5); "This instrument, including all appendixes, constitutes the entire agreement between the parties" (Q11–12, 17–18); and "This [Lease or Sublease] constitutes the entire agreement between the parties with respect to the subject matter hereof." (Q1–5, 15, 23). Some of the leases contain more than one such clause.

**4.** The lease for aircraft 340A–091 has neither an integration clause nor the "interim lease" language. (Eyres Aff., Ex. Q10.)

tegration clauses (and most without them) contain language to this effect:

> This Sublease is being entered into as an interim sublease, pending agreement by Sublessee and Sublessor on a permanent, long-term sublease of the Aircraft, which will supersede this Sublease in all respects, *ab initio.* Sublessor and Sublessee will work together to implement such replacement sublease no later than the expiration of the term of this sublease. No provisions of this Sublease constitute precedents for the provisions of the permanent Sublease.[5]

(Eyres Aff., e.g., Ex. Q19.) The contrast is striking. When the parties intend the long-term leases to supersede the short-term leases, they say so explicitly; but on the question of whether the short-term leases supersede the Term Sheet, they say nothing. This supports the Court's conclusion that the parties did not intend the short-term leases to extinguish the Term Sheet.

If a subsequent writing can be construed in harmony with the original contract, there is no need to alter the original. *Application of Intl. Packaging Co. v. China National Cereals, Oils & Foodstuffs Import & Export Co.,* 159 A.D.2d 190, 559 N.Y.S.2d 302, 305 (1st Dep't 1990). Here, the Term Sheet and the subleases can be harmonized. The Term Sheet clearly contemplated subsequent documentation and provided that its terms "shall prevail." The short-term leases provide that they are interim leases that will eventually be superseded by permanent leases, for which their terms shall not provide any precedent. Read together, the Term Sheet and short-term leases establish that the parties intended the Term Sheet to control until permanent long-term leases could be drafted and executed.

## F. Do LLI and Swedish Holdings Have Rights Under the Term Sheet?

■ Generally, a contract may be enforced only by a party or one in privity with a party. *See Seaver v. Ransom,* 224 N.Y. 233, 120 N.E. 639, 640 (N.Y.1918); *Sone v. Tsumura,* 222 A.D.2d 231, 634 N.Y.S.2d 689, 691 (1st Dep't 1995). LLI and Swedish Holdings did not sign the Term Sheet and are not referenced therein. Although the draft Financing Agreement expressly gives FLI the option to lease planes through affiliated or unaffiliated companies, the Term Sheet says nothing on this issue. The parties have introduced no written assignment of FLI's rights and obligations under the Term Sheet.

It is clear to the Court, however, that LLI and Swedish Holdings delivered, and Mesaba accepted, 9 of the 23 planes. Indeed, the very first planes delivered came from LLI. The deliveries conformed to the Term Sheet as modified by the parties. Mesaba never objected, and never treated these deliveries as a breach of FLI's obligation. In its 10–Q and 10–K statements, Mesaba counted the planes from LLI and Swedish Holdings among those obtained under the Term Sheet.

Given these facts, the Court finds the parties both contemplated, and in all respects acted, as if LLI and Swedish Holdings were integral participants in the Term Sheet agreement. The Court will give effect to the obvious intention of the parties, for the aim of contract law is "to gratify, not to defeat, expectations that arise out of intended contractual agreement[.]" *Tribune,* 670 F.Supp. at 498. Therefore, the Court finds as a matter of law that LLI and Swedish Holdings have the right to

---

**5.** As with the integration clauses, the "interim sublease" paragraph has slight variations which do not affect its interpretation.

enforce the Term Sheet as it relates to the planes they supplied.

### G. *Is the Term Sheet Too Indefinite to Enforce?*

 Regardless of the parties' intent, a court will not enforce a contract unless it is "sufficiently certain and specific ... that what was promised can be ascertained." *Joseph Martin Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981). Mesaba argues that, regardless of what the parties agreed to, the Term Sheet is too indefinite to enforce.

The Court disagrees. The Term Sheet sets forth all essential elements of the lease in terms which were definite enough to allow them to perform and modify their agreement over a period of years. The lease duration itself is sufficiently definite to enforce as long as the Term Sheet provides a methodology by which it may be determined. *Id.* at 250, 417 N.E.2d 541.

 The Court finds that the Term Sheet expressly grants FLI the authority to determine the lease duration within the range of 72 to 96 months, subject to the terms of any applicable head leases. (Term Sheet at 7.) The Court concludes this methodology is sufficiently definite to render the Term Sheet enforceable. The Court, however, further concludes that the Term Sheet's language regarding the four one-year lease extensions is ambiguous.

Whether a contract is ambiguous is a question of law to be determined by looking at the entire contract and the intention of the parties. *See Kass v. Kass,* 91 N.Y.2d 554, 673 N.Y.S.2d 350, 356–57, 696 N.E.2d 174 (1998). While the Term Sheet obliges FLI to make "best efforts" to obtain extensions, it identifies no circumstance which triggers FLI's obligation. The "best efforts" clause might mean either that FLI could unilaterally extend the leases by up to four years, as it argues, or that FLI would be required to seek extensions only if Mesaba requested or desired the extensions, as Mesaba argues.

It is well established that the parties' own construction of an ambiguous term, as evidenced through their course of conduct, may clarify the clause's meaning. *See City of New York v. New York City Ry. Co.,* 193 N.Y. 543, 86 N.E. 565, 567 (1908). However, where "determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence," the question becomes one for a jury. *Hartford Acc. & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907 (1973).

Faced with this ambiguous term, the Court can look to extrinsic evidence. Both sides have submitted extrinsic evidence, but the Court cannot find that the evidence resolves the issue.[6] Accordingly, plaintiffs' motion for summary judgment with regard to the lease extensions is denied.

### III. *Conclusion*

For all the foregoing reasons, plaintiffs' motion for summary judgment is granted

---

**6.** As examples: (a) The Financing Agreement provides that "FLI shall use commercially reasonable efforts to obtain extensions from the Head Lessor so as to allow FLI to provide Mesaba with four (4) one year renewals." (Eyres Aff., Ex. H at 5(a)(ii).); (b) Mesaba's former CEO and general counsel testified that Mesaba had to request the extensions. (Bedford Dep. at 30; Fredericksen Dep. at 121.); (c) FLI's executives testified that it was FLI's option to provide the extensions. (Schroder Dep. at 95, Deposition of Gena Laurent, February 25, 2003, at 74.); and (d) In March 2001, at FLI's request, Mesaba waived FLI's obligation to seek lease extensions.

in part and denied in part. Defendant's motion for summary judgment is denied.

IT IS SO ORDERED.