# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2640

_____

Fairbrook Leasing, Inc., a Delaware    *
corporation; Lambert Leasing, Inc.,    *
a Delaware corporation; Swedish    *
Aircraft Holdings AR, a Swedish    *
corporation,    *    Appeal From the United States
   *    District Court for the
      Appellees,    *    District of Minnesota.
   *
      v.    *
   *
Mesaba Aviation, Inc., a Minnesota    *
corporation,    *
   *
      Appellant.    *

_____

Submitted: January 10, 2005
Filed: May 19, 2005

_____

Before SMITH, HEANEY, and COLLOTON, Circuit Judges.

_____

HEANEY, Circuit Judge.

Appellees Fairbrook Leasing, Inc. (FLI), Lambert Leasing, Inc., and Swedish Aircraft Holdings AR (collectively the Lessors) brought this declaratory judgment action against Appellant, Mesaba Aviation, Inc. (Mesaba). The Lessors sought a declaration that a March 7, 1996 Term Sheet Proposal (Term Sheet) constituted a binding contract that required Mesaba to execute long-term aircraft leases within a

72- to 96-month range. The Lessors also requested a declaration that, pursuant to the Term Sheet, they had the discretion to request four one-year extensions of the 72- to 96-month contemplated lease term.

On December 8, 2003, the district court[1] entered summary judgment, declaring the Term Sheet to be a binding contract, and that the basic lease duration dates for each aircraft at issue were, at a minimum, between 72 and 96 months, subject to any applicable head lease. The district court denied the Lessors' summary judgment motion with regard to the four one-year extensions because it concluded that this portion of the Term Sheet was ambiguous. Following dismissal of the Lessors' claims with prejudice, the district court entered final judgment on June 14, 2004.

Mesaba appeals from this judgment, arguing that the district court erred in concluding that: (1) the Term Sheet constituted a binding contract under New York law; (2) the parties' conduct was consistent with the terms of the Term Sheet; (3) Mesaba failed to negotiate in good faith toward a final binding agreement, entitling the Lessors to performance of the terms of the Term Sheet; and (4) the Lessors' claim for declaratory relief is not time-barred. We affirm.

## BACKGROUND

Mesaba is a regional airline that operates aircraft for the benefit of Northwest Airlines. Mesaba issued a Request for Proposal (RFP) in August 1995 to obtain aircraft to fulfill its pending co-sharing agreement with Northwest Airlines. The Lessors responded to the RFP and offered to provide new Saab 340B+ and used Saab 340A aircraft. On March 7, 1996, Mesaba and the Lessors executed a document entitled "Term Sheet Proposal for the Acquisition of Saab 340 Aircraft by Mesaba

---

[1]The Honorable James M. Rosenbaum, United States Chief District Judge for the District of Minnesota.

Aviation, Inc.," which described the sale of new and the lease of used aircraft. The leasing transaction stated in relevant part, "FLI proposes to sublease twenty (20) 340A Aircraft to Mesaba, subject to existing subleases. Mesaba will also acquire options for twelve (12) Option 340A Aircraft." (Term Sheet at 1.)

The Term Sheet contemplates individual long-term subleases for each aircraft, advance payments expected upon the delivery of the 340A aircraft, the length of the subleases, the basic monthly rent per aircraft, the delivery schedule of the aircraft, and Mesaba's right to assign certain rights to Northwest in the event the code-sharing agreement was not renewed before March 31, 1997. The Term Sheet also includes a section entitled "Conditions Precedent and Effect of This Term Sheet," which defines the validity of the Term Sheet. A subsection entitled "Effect of this Term Sheet" provides:

> By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute, and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996; provided, however, that in the event of any conflict between the terms set forth in this Term Sheet and any such draft, the terms set forth in this Term Sheet shall prevail.

(Term Sheet at 10.) The Term Sheet states that it is not effective unless it has been signed and delivered to all parties, and that SAAI and FLI have received partial payment. The Term Sheet also requires approval by the Board of Directors of all parties. The parties agree that all conditions precedent to effectuating the Term Sheet were fulfilled. The parties also agreed to modify the Term Sheet once Northwest became involved in the negotiations. The Lessors agreed to provide a $13,000 monthly rent rebate from the Term Sheet's specified $44,000 rent per aircraft.

In May 1996, while negotiations on final documents continued,[2] Mesaba began accepting delivery of 340A aircraft. Departing from the Term Sheet, the parties executed short-term subleases ranging from two to three months for each aircraft, instead of the long-term sublease of 72 to 96 months. After further negotiations, the parties concluded only one long-term aircraft lease calling for a term of 96 months. Notwithstanding the parties' failure to complete a finalized agreement, the Lessors continued to deliver, and Mesaba continued to accept, planes under short-term leases, which were extended by agreement several times. Negotiations for long-term leases for the 340A aircraft ultimately ceased in December 1998.

On July 1, 1997, Mesaba and Northwest executed a new ten-year code-sharing agreement that referenced the Term Sheet. The agreement stipulated that no sublease would be for a term longer than the term of the applicable head lease, and that the monthly rent for each 340A aircraft should not exceed $31,000.

In December of 1997, Saab announced it would discontinue its manufacture of the 340 model commercial aircraft. Despite concerns that the cost of maintenance might increase as a result, Mesaba continued to accept delivery of Saab 340A aircraft. Mesaba continued to operate its twenty-three Saab 340A aircraft through 2001, and paid $31,000 per aircraft per month.

In 2001, Mesaba informed FLI that it was going to return some of the leased aircraft. FLI protested that according to the Term Sheet, the aircrafts' lease duration had not expired. Mesaba argued it was bound only by the short-term leases, and once those expired, it could return the aircraft at any time. In October 2002, Mesaba ceased making lease payments for several of the Saab 340A aircraft. Consequently,

---

[2]Although the Term Sheet stipulated an April 15, 1996 deadline for the finalization of their agreement, this date was extended three times. By August 1996, the parties had not finalized negotiations. They continued to negotiate for two more years.

the Lessors commenced this action. The district court granted the Lessors' motion for summary judgment in part, holding that the Term Sheet constituted a binding contractual obligation, and that the Term Sheet expressly granted FLI the authority to determine the lease duration, within the range of 72 to 96 months, subject to the terms of any applicable head lease. The district court determined the Term Sheet was unclear with respect to an issue concerning lease extensions beyond 96 months, and declined to grant summary judgment to the Lessors on that issue. Mesaba appeals.

**ANALYSIS**

This court reviews the district court's grant of summary judgment and its interpretation of state law de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991); *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468-69 (8th Cir. 2004); *Barry v. Barry*, 78 F.3d 375, 379 (8th Cir. 1996). The parties agree that New York law governs the issue presented to us.

The district court succinctly summarized New York's interpretation of preliminary agreements:

> New York law recognizes two types of binding preliminary agreements. The first, ("Type I"), arises when the parties agree on "all the points that require negotiation" and is preliminary only as to form. The parties have the right to demand performance of the transaction. The second, ("Type II"), establishes a framework for agreement, and binds the parties to negotiate in good faith within that framework. The parties are free to walk away once they have "made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing."
>
> * * *
>
> In each type of agreement, as in most contract cases, the parties' intent determines whether they are bound and to what extent. "To discern that

-5-

intent a court must look to the 'words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'"

* * *

To assess whether the parties have demonstrated an intent to be bound by a Type I agreement, a court considers (1) the language of the agreement; (2) the existence of open terms; (3) whether there has been partial performance; and (4) whether the agreement is of the type usually committed to writing. For a Type II agreement, a court considers the same four factors, plus a fifth – the context of the negotiations resulting in the preliminary agreement.

*Fairbrook Leasing, Inc., et al., v. Mesaba Aviation, Inc.*, 295 F. Supp.2d 1063, 1065-70 (D. Minn. Dec. 8, 2003) (citations omitted); *see also Adjustrite Sys., Inc. v. GAB Bus. Servs, Inc.*, 145 F.3d 543, 549 n.6 (2d Cir. 1998); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989); *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 498-500 (S.D.N.Y. June 26, 1987). The negotiations surrounding the Term Sheet and the parties' conduct lead us to conclude that the Lessors and Mesaba entered into a Type II agreement, binding the parties to comply with the Term Sheet. We address each of the five factors relevant to the Type II agreement inquiry below.

We first consider the language of the Term Sheet, and find it reveals the parties' intent to be bound. As the district court explained:

The Term Sheet's length, detail, formality, and completeness lends support to the finding that this document defines the parties' obligations, and is not a mere invitation for them to continue to negotiate. The Term Sheet unambiguously states that, "By signing this Term Sheet, SAAI, FLI, and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation . . . ." This language does not indicate a qualification or hesitation concerning the existence of an agreement; it merely indicates that scrivener work–"definitive documentation"–

-6-

remains to be done. The Term Sheet's language explicitly resolves future issues which may arise as the conforming documents are drafted. It does so by specifying that in the event of a conflict between the Term Sheet's terms and any subsequent drafts, the Term Sheet's terms shall prevail.

*Fairbrook Leasing*, 295 F. Supp.2d at 1070-71. Additionally, both parties initialed the first ten pages of the Term Sheet and signed the document on the last page. They agreed the Term Sheet would be governed by New York law in matters of "construction, validity and performance." Furthermore, the parties avoided making the Term Sheet effective on the execution of formal documentation. The district court was correct in concluding that the language of the Term Sheet indicates the parties intended the document to be binding and enforceable.

We next consider whether there are sufficient open terms to conclude the parties did not intend to be bound. Again, this factor favors the Lessors. "[A] court should consider the broad framework of a contract in determining whether missing terms are actually essential–that is, necessary to make the agreement legally binding." *Shann v. Dunk*, 84 F.3d 73, 79 (2d Cir. 1996). "Disputed terms are not to be considered in isolation, but in the context of the overall agreement." *Id.* (quotation omitted). Mesaba claims the Term Sheet omitted maintenance and refurbishment obligations, insurance obligations, limitations as to manner and location of use, stipulated loss values, and return conditions and asserts these terms are essential and open, precluding a binding agreement. The district court responded to this assertion in this way:

> The Court considers Mesaba's objections on this ground to be cavils. The Term Sheet sets out a commitment to obtain described aircraft . . . . Other than the inconsequential absence of a stated delivery location, there is no indication that either party has ever had the slightest complaint about the date, timing, or place of delivery. The monthly

-7-

lease rate was not only established, but was satisfactorily modified by the parties' subsequent agreement.

*Fairbrook Leasing*, 295 F. Supp.2d at 1071-72. While we agree that the presence of material open terms while negotiations continue suggests the parties do not intend to be bound, the district court properly concluded that all of the essential terms had been agreed upon in the Term Sheet. None of the open terms cited by Mesaba were material, and were therefore inconsequential to the agreement.

Partial performance is the third factor in the analysis. A party seeking to avoid an agreement who accepts performance tendered by a party seeking to enforce that agreement is either estopped from denying the existence of the agreement because he accepted the benefit of the very agreement that he is now seeking to avoid, or he is bound to the agreement because his conduct in accepting the tendered performance serves as an affirmative ratification of the existence of the agreement. *See Merrill Lynch Interfunding v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998). The undisputed evidence shows there has been prolonged, and in some cases, complete performance of the agreement as set out by the Term Sheet. For a period of six years, the parties complied with the majority of the terms and provisions delineated in the Term Sheet. The district court explained, and no party disputes, that:

> [p]laintiffs delivered, and defendant paid for, twenty-three aircraft, even in the absence of final documents. This occurred using only the Term Sheet. The parties' performance continued, even recognizing that other collateral matters might remain. These aircraft were unquestionably of benefit to Mesaba, constituting as they did an essential part of its fleet.

*Fairbrook Leasing*, 295 F. Supp.2d at 1072. We agree the parties' conduct signaled they believed they were operating under a binding agreement, and find this factor weighs in favor of the plaintiffs as well.

We next consider whether a written agreement is customary for the sort of services and payments exchanged by the parties. It is clear that the parties extensively negotiated and committed to writing the terms of their agreement in the Term Sheet, and adjusted the terms of the agreement as required. Yet, the size of the transaction, the nature of the assets being leased, and the length of the contemplated leases appear to us to warrant not only a writing, but "a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts." *Adjustrite*, 145 F.3d at 551. Ideally, the parties would have finalized their negotiations and recorded their agreement in a document formally exchanged and signed. They did not. The district court noted, "[t]his does not mean the parties did not have a contract; they did–the Term Sheet." *Fairbrook Leasing*, 295 F. Supp.2d at 1072. While we agree the Term Sheet outlined the terms of their agreement and expressed a clear intent by both parties to be bound by its terms, and to continue to negotiate in good faith, it does not constitute a formal contract. This factor weighs in favor of the defendants. This conclusion, however, does not negate our holding that the Lessors and Mesaba intended to be bound by the terms of the Term Sheet as we shall next discuss.

The fifth and final factor that requires our consideration is the context of the negotiations between the Lessors and Mesaba. The Term Sheet recorded agreement on the major terms of the lease: the identity of the lessor and lessee, the number of planes, the rent for each, the configuration of each plane, the delivery schedule, and the lease term. The parties performed the major terms of their agreement as they continued to negotiate the minor terms. Mesaba clearly needed the Lessors' performance to fulfill its obligations to its ten-year code-sharing agreement with Northwest. "In signing the Term Sheet, Mesaba agreed to execute, or at the very least to negotiate in good faith, long-term leases for each airplane. Mesaba's refusal to continue negotiating long-term leases may not involve subjective bad faith, but nonetheless, constitutes a breach of its obligations under the Term Sheet." *Id.* at 1073. We find the Term Sheet satisfies the requirements of a Type II agreement; at

a minimum, Mesaba and the Lessors bound themselves to a framework that mandated good faith negotiations over the remaining open terms of their agreement. We conclude that the Term Sheet "represented a binding preliminary commitment and obligated both sides to seek to conclude a final [agreement] upon the agreed terms by negotiating in good faith to resolve such additional terms as are customary in such agreements." *Teachers Ins. & Annuity Assoc. of Am.*, 670 F. Supp. at 499.

Finally, Mesaba argues the district court erred in concluding that the Lessors' declaratory judgment claims are not time-barred. Its statute of limitations claim fails. New York law requires that "an action upon a contractual obligation or liability" be commenced within six years. N.Y. C.P.L.R. § 213(2) (2002). "[A] cause of action for breach of contract accrues and the statute of limitations commences when the contract is breached." *Raine v. RKO Gen., Inc.*, 138 F.3d 90, 93 (2d Cir. 1998). The Lessors filed their declaratory judgment action on October 4, 2002. Mesaba asserts that August 30, 1996, the extended deadline for the parties to conclude negotiations and execute a formal contract, marked the beginning of the statute of limitations for any contractual claim, and that any claim filed after August 30, 2002 is therefore time-barred. Mesaba also argues that the written lease agreements, not the Term Sheet, governed the transactions made in 2001.

We cannot accept Mesaba's argument. "When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old." *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946). Mesaba was still receiving aircraft and paying rent in October 2001 pursuant to an agreement made between the parties; this action commenced one year later, well within the six-year statute of limitations. Furthermore, it is undisputed that in October of 1996, the parties were performing their obligations under the Term Sheet, and continuing to negotiate definitive documentation for another two years. We are

-10-

persuaded that the district court properly concluded that the Lessors' claims related to the agreement were timely.

For the reasons cited above, we affirm the district court.

COLLOTON, Circuit Judge, dissenting.

I agree with the court's articulation of New York law with respect to preliminary agreements. A Type I agreement "arises when the parties agree on all the points that require negotiation" and permits parties to demand performance of the transaction, and a Type II agreement "establishes a framework for agreement, and binds the parties to negotiate in good faith within that framework." *Ante* at 5 (quoting *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 295 F. Supp. 2d 1063, 1065 (D. Minn. 2003)). I respectfully dissent, however, because I do not believe the undisputed facts demonstrate as a matter of law that Mesaba breached a Type II agreement, and because even assuming the existence of a Type II agreement, it does not give FLI a right to demand that Mesaba execute long-term airplane leases worth millions of dollars. The court does not rely on FLI's principal argument that the "Term Sheet Proposal" is a binding Type I agreement as a matter of law, and I also find that contention unpersuasive. In reaching my conclusion, I bear in mind that "[o]rdinarily, preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations," *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996), and that a court should find a binding contractual obligation only in "rare instances," where a preliminary agreement "clearly manifests" such an intention. *Id*.

A Type II agreement merely "binds the parties to negotiate in good faith," and I believe that determining whether such an agreement was breached in this case requires resolution of factual disputes. Questions of good faith are "notoriously inappropriate" for resolution at summary judgment, *Krishna v. Colgate Palmolive*

*Co.*, 7 F.3d 11, 16 (2d Cir. 1993), and here, I think there is enough evidence from which a jury could infer Mesaba's good faith throughout the negotiation process to create a genuine issue of material fact. FLI's former CEO acknowledged that the parties "diligently set out to negotiate" and participated "to the best of their ability." (Appellant's App. at 71, 73). That the parties reached agreement on short-term leases while they negotiated further supports an inference that they were engaged in the negotiation process with a good-faith intent to reach agreement on longer-term leases. To be sure, FLI argues that Mesaba breached its obligations of good faith by insisting on terms that were outside the Term Sheet and refusing to sign long-term leases until its new demands were met. But I believe such factual disputes regarding Mesaba's good faith during the negotiation process are properly resolved by a jury in this case, and not on summary judgment.

Furthermore, even if Mesaba has breached a Type II agreement, such an agreement "does not commit parties to their ultimate contractual objective," and "[a] party to such a binding preliminary commitment has no right to demand performance of the transaction." *Adjustrite Sys., Inc. v. GAB Bus. Servs.,* 145 F.3d 543, 548 (2d. Cir. 1998) (internal quotations omitted). "Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." *Id.* If the evidence demonstrates breach of a Type II agreement, then FLI is not entitled to relief as though the parties ultimately had reached the long-term airplane lease agreement toward which they had agreed to negotiate. *See also Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356, 1360-61 (N.Y. 1992).

Although FLI devotes the great majority of its argument to defending the district court's conclusion that the Term Sheet constitutes a Type I agreement under New York law, the court does not rely at all on this proposition. There are "two distinct types" of preliminary contracts with binding force, *Teachers Ins. and Annuity*

*Ass'n of Am. v. Tribune Co.,* 670 F. Supp. 491, 498 (S.D.N.Y. 1987), and the court implicitly rejects FLI's position concerning a Type I agreement by concluding that the Term Sheet constitutes a Type II preliminary binding commitment to negotiate in good faith. While the multi-factor analysis prescribed by New York law is hardly precise, I ultimately conclude that the four factors relevant to the analysis of this preliminary agreement – the agreement's language, the existence of open terms, the parties' partial performance, and whether this type of agreement usually is committed to writing – weigh in favor of finding that the parties did not intend for the Term Sheet to be binding as a Type I airplane lease agreement.

FLI contends that the parties, through the Term Sheet Proposal, agreed to a multi-million dollar airplane lease contract. This undoubtedly is the sort of agreement that usually is committed to writing, and it is undisputed that the Term Sheet lacks the written detail and specificity typical of an airplane lease agreement.

The language of the "Term Sheet Proposal" itself also suggests that it amounts to something less than a formal airplane lease agreement. The document is entitled a "proposal," *see Adjustrite Systems*, 145 F.3d at 549, not a "Term Sheet Contract," as FLI refers to the document throughout its brief. The proposal identifies its own effect more narrowly than FLI urges. In the paragraph headed "EFFECT OF THIS TERM SHEET," the agreement reads: "By signing this Term Sheet, SAAI, FLI and Mesaba evidence their agreement to negotiate, execute, and deliver definitive documentation in substantially the form and substance of the 2/18/96 drafts of the above-listed documents no later than April 15, 1996." (Add. at 25). To my mind, the relevant verbs – "to *negotiate*, execute, and deliver" – contemplate more than mere scrivener's work. The language suggests that there are terms yet to be settled between the parties, and the contemplation of further negotiation tends to show that the parties had not reached a complete agreement. A Type I agreement, by contrast, occurs when "parties have reached complete agreement . . . on all the issues perceived to require negotiation," and "more elaborate formalization" is "not necessary," but

-13-

"merely considered desirable." *Tribune Co.,* 670 F. Supp. at 498; *see also Adjustrite Sys., Inc.*, 145 F.3d at 547-48 (applying *Tribune Co.* and acknowledging that it articulated the "framework" for analyzing preliminary agreements under New York law).

The parties' subsequent performance similarly suggests that the Term Sheet was a preliminary agreement that was not intended to be binding as an airplane lease contract. Although the court quotes the district court's conclusion that Mesaba accepted delivery of 23 aircraft "using only the Term Sheet," *ante* at 8, the parties in fact executed separate short-term subleases covering those aircraft. These short-term leases do not refer to the Term Sheet, and many of them say that they "constitute[] the entire agreement between the parties." The lease terms of the short-term leases do not match the proposed terms in the Term Sheet, further suggesting that the parties were not carrying out lease obligations pursuant to the Term Sheet.

That separate short-term leases were necessary is not surprising. The Term Sheet itself is silent with respect to many issues that one would expect to find in a lease agreement, including maintenance obligations, insurance, stipulated loss values, and return conditions. While these matters may not be the most important terms in an airplane lease agreement, I do not share the view that they are immaterial. These open terms again suggest that the Term Sheet was not meant to be a binding lease agreement, but rather a "framework for agreement" within which the parties were bound to stay.

For these reasons, I would hold that the record fails to establish a binding Type I agreement as a matter of law, and remand the case for further proceedings on the question whether Mesaba breached a Type II agreement to negotiate in good faith within the framework of the Term Sheet Proposal.

_____

-14-