# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-2027

———————

Fairbrook Leasing, Inc., et al.,         *
                                      *

      Plaintiffs - Appellants,     *

                                      *   Appeal from the United States

    v.                           *   District Court for the

                                        *   District of Minnesota.

Mesaba Aviation, Inc.,          *

                                        *

      Defendant - Appellee.      *

———————

Submitted: October 18, 2007
Filed: March 4, 2008

———————

Before LOKEN, Chief Judge, GRUENDER and BENTON, Circuit Judges.

———————

LOKEN, Chief Judge.

In March 1996, Mesaba Aviation, Inc. ("Mesaba"), a regional airline, and subsidiaries of Swedish airplane manufacturer Saab AB[1] executed a document entitled, "Term Sheet Proposal for the Acquisition of Saab 340 Aircraft by Mesaba Aviation, Inc." (the "Term Sheet"). The Term Sheet called for Mesaba to purchase thirty new 340B*Plus* aircraft from Saab and to sublease twenty used 340A aircraft from Fairbrook. The Term Sheet recited that it was "a summary of selected elements" of the final agreement; the parties agreed "to negotiate, execute, and deliver definitive

———————

[1]Fairbrook Leasing, Inc., Lambert Leasing, Inc., and Swedish Aircraft Holdings AB (collectively, "Fairbrook").

documentation . . . in substantially the form and substance of the 2/18/96 drafts . . . no later than April 15, 1996." Though no final agreement was ever signed, Fairbrook delivered a total of twenty-three used 340A aircraft to Mesaba. The parties executed short-term subleases on each aircraft, mistakenly expecting that a final agreement would eventually be signed.

In 2002, after Mesaba announced that it would return the leased aircraft, Fairbrook sought a declaratory judgment to enforce the long-term lease provisions of the Term Sheet. Applying New York law, we affirmed the district court's grant of summary judgment in favor of Fairbrook. Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 408 F.3d 460, 465-67 (8th Cir. 2005) ("Fairbrook I"). Fairbrook commenced this separate action in district court seeking expectancy (benefit-of-the-bargain) damages for Mesaba's breach of the Term Sheet agreement. The district court[2] granted summary judgment for Mesaba, concluding that, under New York law, the Term Sheet is a "Type II" preliminary agreement for the breach of which no expectancy damages may be recovered. Fairbrook appeals. We affirm.

## I. Background.

In addition to lengthy provisions regarding the financing and purchase of new Saab 340B*Plus* aircraft, the Term Sheet provided that Mesaba would sublease twenty used 340A aircraft from Fairbrook for $44,000 per month, subject to a $13,000 per month rebate if Mesaba met certain conditions such as avoiding default. The Term Sheet further provided that individual subleases would be signed for each aircraft and that "the term of each Sublease will be between 72 and 96 months . . . with best efforts to obtain four (4), one (1) year extensions at the same Basic Rent." The Term Sheet contained details about the configuration, delivery, and refurbishment of each

---

[2]The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota.

aircraft and three conditions precedent, all of which were satisfied. It provided that New York law would govern its construction, validity, and performance. After signing the Term Sheet, Fairbrook acquired from third parties the right to sublease the twenty aircraft for the full term specified in the Term Sheet and spent up to $500,000 refurbishing each plane. Mesaba reported in its annual 10-K and quarterly 10-Q SEC filings that it had entered into an agreement to convert its fleet to Saab aircraft.

Fairbrook delivered twenty-three 340A aircraft to Mesaba between May 1996 and June 1998. The parties executed interim subleases for each and extended the Term Sheet's deadline for the execution of a final sublease agreement. In late 1997, Saab announced it would stop manufacturing commercial aircraft. Worried about the impact on maintenance and repair costs, Mesaba insisted that Saab pay for certain maintenance costs on the 340A aircraft that were not included in the maintenance agreement covering the purchased 340B*Plus* aircraft. Mesaba's negotiators admitted that Mesaba refused to sign long-term subleases on the 340A aircraft in part to gain "leverage" to obtain this concession. Mesaba also wanted to shorten the sublease term on some 340A aircraft to conform to Mesaba's policy of not keeping aircraft in service longer than seventeen years. Negotiations toward a final contract ultimately ceased in December 1998.

Mesaba operated the twenty-three 340A aircraft through 2001, making timely lease payments of $31,000 per month. Three were returned by agreement in December 2001.[3] In July 2002, Mesaba gave notice that it would return the twenty

---

[3]Fairbrook objected to the condition of the returned aircraft, demanded that Mesaba continue paying rent until they were upgraded, and claimed that Mesaba's refusal to do so was a Term Sheet default that forfeited Mesaba's right to receive the monthly rebate on the remaining twenty aircraft. Though the Fairbrook I majority opined that "all of the essential terms had been agreed upon," 408 F.3d at 466, the Term Sheet was silent on the critical question of return condition. The record does not reflect how this separate dispute over return condition was resolved.

remaining aircraft by October 2004. In October 2002, Mesaba stopped making lease payments on several aircraft. Fairbrook then commenced the declaratory judgment action to enforce the Term Sheet, taking the position that Mesaba was bound to the full extended twelve-year sublease term for each aircraft.

## II. Fairbrook I.

In the declaratory judgment action, the parties filed cross motions for summary judgment. The district court denied Mesaba's motion and granted *partial* summary judgment in favor of Fairbrook, concluding that, even though the Term Sheet was a "preliminary agreement," it was an enforceable contract because its "length, detail, formality, and completeness lend[] support to the finding that this document defines the parties' obligations, and is not a mere invitation for them to continue to negotiate." Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 295 F. Supp. 2d 1063, 1069-70 (D. Minn. 2003). Alternatively, the court held that the parties to the Term Sheet "bound themselves at a minimum to a framework within which to negotiate open terms in good faith," and Mesaba breached this duty by seeking concessions that contradicted the Term Sheet's "framework." Id. at 1073. The court concluded that Fairbrook could enforce the Term Sheet subleases up to ninety-six months but denied Fairbrook summary judgment on its claim that it was entitled to unilaterally extend the Term Sheet subleases an additional four years. Id. at 1076.

In June 2004, the parties entered into a Stipulation reciting that the "Order of December 8, 2003 is the extent of the declarations sought by [Fairbrook] at this time" and dismissing *without prejudice* Fairbrook's claims for four-year sublease extensions. "Accordingly," the Stipulation recited, "final judgment may be entered on the Court's December 8, 2003 Order to allow [Mesaba] to appeal that order at this time." The court entered an Order that the remaining claims were dismissed without

prejudice and directed that "final judgment be entered."[4]  The Clerk entered a separate Judgment the next day containing no substantive terms.

Although Fairbrook filed the action seeking a declaratory judgment and referred to "declarations" in the Stipulation that manufactured a final order for appeal, *the "final" Order of December 8, 2003, contained no declaratory judgment*.  Cf. Azeez v. Fairman, 795 F.2d 1296, 1297 (7th Cir. 1986).  It was in substance an interlocutory order granting *partial* summary judgment.  As the district court's decision was based on alternative grounds, the preclusive effect of the summary judgment we affirmed in Fairbrook I must be determined by examining our opinion, not the district court's Order.  Fairbrook interprets Fairbrook I as holding that the Term Sheet was a "Type I," fully enforceable long-term contract entitling Fairbrook to the benefit of its bargain, namely, damages equal to $44,000 per month per aircraft for the fully extended twelve-year subleases.  Mesaba construes Fairbrook I as concluding that the Term Sheet was a binding commitment only to negotiate the remaining open terms in good faith.  To frame this dispute, it is necessary to examine New York contract law before we review the district court's decision to adopt Mesaba's interpretation of Fairbrook I.  We review the district court's grant of summary judgment and its interpretation of state law *de novo*.  408 F.3d at 464.

---

[4]Despite our frequent warnings, many lawyers use this dismissal-without-prejudice tactic to evade the statute limiting our appellate jurisdiction to the review of final orders.  Regrettably, we often review such bogus final orders, as in Fairbrook I.  See generally Great Rivers Coop. of S.E. Iowa v. Farmland Indus., Inc., 198 F.3d 685, 688-90 (8th Cir. 1999).  Even more regrettably, we did not in Fairbrook I declare the dismissal of the remaining claims to be *with* prejudice, as we did in Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1245 (8th Cir. 1994), which would have foreclosed Fairbrook's attempt to revive its claims for extended subleases in this action.  In any event, if Fairbrook's use of this distasteful tactic has produced a result less favorable than had it litigated Fairbrook I to a proper final disposition by the district court, we have no sympathy for misfortune of its own making.

### III. The New York Law of Preliminary Agreements.

In general, New York courts will not enforce "a mere agreement to agree, in which a material term is left for future negotiations." Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541, 543 (N.Y. 1981). But the intent of the parties is controlling. Therefore, a contract is enforceable even though it leaves some elements for future negotiation and agreement "if some objective method of determin[ing the open terms] is available, independent of either party's mere wish or desire." Metro-Goldwyn-Mayer, Inc. v. Scheider, 360 N.E.2d 930, 931 (N.Y. 1976). The absence of a contemplated formal agreement is also not dispositive. If the parties do not intend to be bound until a formal agreement is signed, there is no contract until that event occurs. "On the other hand . . . where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document." R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984) (quotation omitted). In addition, even if the parties have not agreed on all the essential terms of a final agreement, a New York court may conclude that they entered into an enforceable "good-faith contractual obligation to cooperate" in the negotiation of a final agreement. Goodstein Constr. Corp. v. City of New York, 494 N.E.2d 99, 100 (N.Y. 1986).

A federal court in New York attempted to synthesize these diverse principles in Teachers Insurance & Annuity Association of America v. Tribune Co., 670 F. Supp. 491, 498-99 (S.D.N.Y. 1987) ("Tribune"). Recognizing a "strong presumption" against finding binding obligations in preliminary understandings that include open terms and call for future approvals and the execution of contract documents, the court nonetheless identified two types of preliminary agreements that are given binding force. "One occurs when the parties have reached complete agreement . . . on all the issues perceived to require negotiation. Such an agreement is preliminary only in form . . . . The second . . . expresses mutual commitment to a contract on agreed

major terms, while recognizing the existence of open terms that remain to be negotiated." In this second type, the parties "bind themselves to a concededly incomplete agreement in the sense that they negotiate together in good faith . . . to reach final agreement within the scope that has been settled in the preliminary agreement." In Tribune, the court enforced a preliminary commitment for a long-term loan that recited it was a "binding agreement" after the borrower used the commitment to its advantage before refusing to close on the final agreement because interest rates had declined.

Two years later, in Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989), the Second Circuit observed that, in determining whether "a preliminary manifestation of assent was a binding preliminary agreement of the second type," the court in Tribune "used a modified version of a test that this court devised for preliminary agreements that more closely resemble the first type." Looking no further than the first factor of that test, the court in Arcadian held that the preliminary agreement at issue was not binding because references that negotiations might fail and that a binding agreement would be completed in the future demonstrated the parties did not intend to be bound.

Tribune and Arcadian were concerned with identifying when an agreement of the "second type" is an enforceable agreement to negotiate a contemplated final agreement. In some later cases, however, the federal courts in New York have declared there are two types of binding preliminary agreements, "Type I" and "Type II," distinguished only by a fifth, highly subjective factor, the "context" of the negotiations. See Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548-51 (2d Cir. 1998); Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996); Krauth v. Executive Telecard, Ltd., 890 F. Supp. 269, 293 (S.D.N.Y. 1995). In contrast, New York's intermediate appellate courts have held, consistent with Goodstein, that parties can enter into binding preliminary agreements to negotiate a final contract in good faith, but we have found no New York appellate decision enforcing a "Type I" agreement,

or even recognizing the Type I-Type II dichotomy applied by the federal courts. <u>See</u> <u>180 Water St. Assocs., L.P. v. Lehman Bros. Holdings, Inc.</u>, 776 N.Y.S. 2d 278, 279 (N.Y. App. Div. 2004); <u>SNC, Ltd. v. Kamine Eng'g & Mech. Contracting Co.</u>, 655 N.Y.S. 2d 47, 48 (N.Y. App. Div. 1997).

After reviewing this array of decisions, we have serious doubt whether the so-called Type I binding preliminary agreement occupies a legitimate place in New York contract law. Much of our doubt is based on experience. When negotiating and drafting countless contracts in our prior legal careers, we rarely if ever encountered a "memorandum of understanding" or a "preliminary agreement" that required nothing more than the wordsmithing of a true scrivener to become a "final contract." When such a document is encountered -- and the expressly binding commitment letters in <u>Tribune</u> and contemporaneous cases[5] may be examples, even though the federal courts described them as "Type II" preliminary agreements -- it should be enforced as a final, not as a preliminary, agreement. Any document less final, if binding under New York law, should be enforced as a preliminary agreement to negotiate in good faith in accordance with the two opinions of the New York Court of Appeals in <u>Goodstein</u>,[6] unless, consistent with <u>Scheider</u>, there is "some objective method" of determining its open terms "independent of either party's mere wish or desire," 360 N.E.2d at 931.

This case well illustrates our reluctance to acknowledge the Type I category of binding preliminary agreements. After the Term Sheet was signed, any lawyer worth her salt would not have signed off on a final contract committing client Mesaba to sublease twenty expensive airplanes for eight years, and granting the sublessor options

---

[5]<u>Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal</u>, 791 F. Supp. 401 (S.D.N.Y. 1991); <u>Teachers Ins. & Annuity Ass'n of Am. v. Butler</u>, 626 F. Supp. 1229 (S.D.N.Y. 1986).

[6]<u>Goodstein</u>, 494 N.E.2d at 100, and its sequel, <u>Goodstein Constr. Corp. v. City of N.Y.</u>, 604 N.E.2d 1356 (N.Y. 1992) ("<u>Goodstein II</u>").

for four more years, without seeking to negotiate whether there might be unforseen circumstances (in addition to an act of God) that should relieve Mesaba of its long-term commitment. A premature decision by Saab to stop supporting the 340 series of aircraft is an example of a circumstance that might warrant bargaining.

## IV. The District Court's Rulings.

**A. Type I or Type II Agreement.** In Fairbrook I, we reviewed a summary judgment opinion, interlocutory at the time it was issued, alternatively ruling that the Term Sheet was a Type I *and* a Type II binding preliminary agreement. In affirming, we expressly held that the "negotiations surrounding the Term Sheet and the parties' conduct lead us to conclude that [Fairbrook] and Mesaba entered into a Type II agreement, binding the parties to comply with the Term Sheet." 408 F.3d at 465. Therefore, we concluded, "at a minimum, Mesaba and [Fairbrook] bound themselves to a framework that mandated good faith negotiations over the remaining open terms of their agreement." Id. at 467. We further concluded, over Judge Colloton's dissent, that Mesaba's insistence on final sublease terms contrary to provisions in the Term Sheet was a breach of its commitment to negotiate "the remaining open terms" in good faith. Id.

In resolving the parties' cross motions for summary judgment in this case, the district court after careful review construed our opinion in Fairbrook I as concluding that the Term Sheet was a Type II preliminary agreement. We agree. The court further concluded that basic principles of issue preclusion bar Fairbrook from relying on the district court's alternative ruling that the Term Sheet was a Type I agreement because that ruling was not upheld on appeal. Again, we agree. See RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. o (1982); Adjustrite, 145 F.3d at 548 (explaining that Type I and Type II agreements give rise to different obligations). Fairbrook argues at length that, when we affirmed in Fairbrook I, we implicitly upheld the district court's conclusion that the Term Sheet was a Type I agreement. But this contention is contrary to the explicit holding in our prior opinion. Moreover, if this

were an open issue because <u>Fairbrook I</u> was ambiguous, we have no difficulty concluding as a matter of law that the Term Sheet was, at most, a binding Type II preliminary agreement. To reach this conclusion, we look no further than the parties' understanding that separate interim sublease agreements were required for each aircraft while the final sublease documents were being negotiated.

**B. Remedies for Breach of a Type II Agreement.** Because we held in <u>Fairbrook I</u> that Mesaba breached a Type II preliminary agreement to negotiate the final sublease agreement in good faith, the district court next considered what remedies are available to Fairbrook for this type of breach. Invoking general principles governing the recovery of lost profits for breach of contract, Fairbrook argued that it was entitled to damages equal to all lost revenues over the life of the subleases contemplated in the Term Sheet. The district court rejected this contention, concluding that the issue was instead controlled by the decision of the New York Court of Appeals in <u>Goodstein II</u>. Agreeing with New York federal court decisions, the district court held that <u>Goodstein II</u> "prohibits the award of expectancy damages for the breach of a preliminary agreement." <u>See</u> <u>Westerbeke Corp. v. Daihatsu Motor Co.</u>, 304 F.3d 200, 210 (2d Cir. 2002); <u>Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.</u>, 92 F. Supp. 2d 249, 255 n.2 (S.D.N.Y.), <u>aff'd</u>, 242 F.3d 365 (2d Cir. 2000).[7]

On appeal, Fairbrook urges us to limit <u>Goodstein II</u> to its "extreme" facts and apply the normal contract principle that lost profits may be recovered from the breaching party if such damages were reasonably foreseeable and can be measured with reasonable certainty. <u>See</u> <u>Ashland Mgmt. Inc. v. Janien</u>, 624 N.E.2d 1007, 1010 (N.Y. 1993). In support, Fairbrook notes that New York federal courts awarded lost profits for the breach of Type II agreements in two cases decided before <u>Goodstein II</u>,

---

[7]New York's intermediate appellate courts have likewise read <u>Goodstein II</u> as categorically precluding expectancy damages for breach of a binding preliminary agreement to negotiate a final agreement in good faith. <u>See</u> <u>180 Water St. Assocs.</u>, 776 N.Y.S. 2d at 279; <u>Sands Bros. v. Generex Pharms., Inc.</u>, 749 N.Y.S. 2d 17, 18 (N.Y. App. Div. 2002); <u>accord</u> <u>Fairbrook I</u>, 408 F.3d at 469 (Colloton, J., dissenting).

Teachers Insurance v. Ormesa, 791 F. Supp. at 415, and Teachers Insurance v. Butler, 626 F. Supp. at 1236, and in a more recent case that did not cite Goodstein II, Network Enterprises, Inc. v. APBA Offshore Productions, Inc., 427 F. Supp. 2d 463, 487 (S.D.N.Y. 2006).

We are not as confident as the district court that Goodstein II should be read as categorically precluding benefit-of-the-bargain damages for all breaches of binding preliminary agreements to negotiate a final agreement in good faith. This is a difficult, largely unsettled question of remedies. See the conflicting opinions in Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 278, 281 (7th Cir. 1996) (applying Illinois law). Goodstein II rejected an award of expectancy damages in part because "if no agreement was reached and . . . it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation." 604 N.E.2d at 1361, quoting 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.26a, p. 314 (1st ed. 1990). But what if it can be discerned what agreement would have been reached? What if, for example, the open terms left to be negotiated can be determined by "objective criteria . . . found in the agreement itself, commercial practice or other usage and custom," as in Scheider, 360 N.E.2d at 931?

To put the question more concretely, consider Teachers Insurance v. Butler, a pre-Goodstein II case in which a borrower reaped the benefits of the lender's preliminary loan commitment for nineteen months and then, because interest rates had declined, refused to sign the final agreement, ostensibly because it contained an additional provision that was consistent with the lender's and the lending industry's practice. The court held that the lender was entitled to benefit-of-the-bargain damages -- the difference between the interest rate specified in the commitment letter and the interest rate at the time of the breach. 626 F. Supp. at 1236. The court in Tribune allowed the same lender to recover the benefit of a similar commitment letter but described the commitment letters as Type II agreements. 670 F. Supp. at 507. Would the New York Court of Appeals, applying its later Goodstein II decision, reach a

different result, precluding recovery of the interest rate differential because it is an expectancy-type measure of damages? We suspect not.

Though we are uncertain whether the New York Court of Appeals would construe Goodstein II as categorically as did the district court and the cases on which that court relied, we have no difficulty affirming the district court's decision that expectancy damages may not be recovered in this case. The Goodstein II court denied expectancy damages because

> the City's sole obligation . . . was to negotiate in good faith. . . . To allow the profits that plaintiff might have made under the prospective [final agreement] as the damages for breach of the exclusive negotiating agreements would be basing damages . . . on the prospective terms of a nonexistent contract which the City was fully at liberty to reject. It would, in effect, be transforming the agreement to negotiate for a contract into the contract itself. . . . [A] party's alleged failure to negotiate in good faith is not a but-for cause of plaintiff's lost profits, since even with the best of faith on both sides the deal might not have been closed . . . .

Goodstein II, 604 N.E.2d at 1360-61 (quotation omitted). The same reasoning applies in this case. The Term Sheet was silent on significant issues such as the allocation of maintenance costs and the condition of returned aircraft. The parties were not obligated to agree on these issues, nor can the missing terms be judicially determined by objective criteria in the Term Sheet itself or in commercial practice, usage, or custom. In effect, Fairbrook asks us to do what New York law prohibits -- transform a binding preliminary agreement to negotiate for a contract into the contract itself. The district court properly concluded that Fairbrook may not recover unpaid sublease revenues for Mesaba's breach of its duty to negotiate a final sublease in good faith.

Finally, Fairbrook argues that the district court erred in dismissing its claim for out-of-pocket expenses incurred in reliance on the binding preliminary agreement to negotiate. It is undisputed that reliance damages are recoverable under New York law.

See Westerbeke, 304 F.3d at 210; 180 Water St. Assocs., 776 N.Y.S.2d at 279. The goal of reliance damages is to allow "recover[y] for those efforts that were to [a party's] detriment and thereby placed him in a worse position." Farash v. Sykes Datatronics, Inc., 452 N.E.2d 1245, 1246 (N.Y. 1983); RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981). However, this issue was not properly preserved for appeal.

In the district court, Fairbrook's complaint stated five claims for various categories of "rent" for Mesaba's breach of the Term Sheet. Mesaba filed the first motion for summary judgment, arguing that Fairbrook may only recover reliance damages for Mesaba's alleged breach of a Type II preliminary agreement, and that Fairbrook had conceded its reliance damages were *de minimis*.[8] One month later, Fairbrook filed its cross motion for summary judgment, arguing only that it was entitled to recover the benefit of its bargain -- past and future unpaid gross sublease rent -- whether the Term Sheet was a Type I or a Type II agreement. One month after that, Fairbrook filed its memorandum opposing Mesaba's motion. On the next-to-last page of its brief, after forty pages arguing its claims for expectancy damages, Fairbrook asserted in a two-sentence footnote that, even if New York law did limit Fairbrook to its reliance damages, that claim "likely exceeds the amounts that [Fairbrook] seek[s] to recover for the benefit of [its] bargain." Fairbrook then listed as examples of its reliance damages "headlease obligations for leased aircraft, ownership costs on equity aircraft, and refurbishment costs."

In the Background section of its summary judgment Memorandum and Order, the district court noted that Fairbrook "admitted that under a Type II agreement, its out-of-pocket expenses would be *de minimis*." The court did not discuss the issue further. Fairbrook never sought to amend its complaint to assert a claim for reliance damages; never sought additional time to present evidence on this potential summary judgment issue, see FED. R. CIV. P. 56(f); and did not file a motion urging the district court to

---

[8]Mesaba further submitted detailed evidence showing that it had paid Fairbrook a total of $53,537,000 in rent under the interim subleases for the 340A aircraft.

reconsider its summary dismissal of the issue. Nonetheless, Fairbrook argues for the first time on appeal that it never conceded its overall reliance expenditures were *de minimis,* only that its expenses related to the negotiation of the Term Sheet were *de minimis*. Thus, the reliance damages issue was not properly preserved in the district court, either factually or legally. We decline to exercise our limited discretion to consider an issue raised for the first time in an appeal taken after years of extensive litigation. <u>See</u> <u>Fjelsta v. Zogg Dermatology, PLC</u>, 488 F.3d 804, 809 (8th Cir. 2007); <u>Von Kerssenbrock-Praschma v. Saunders</u>, 121 F.3d 373, 375-77 (8th Cir. 1997).

The judgment of the district court is affirmed.

_____