*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-912

UNITED HOUSE OF PRAYER FOR ALL PEOPLE, APPELLANT,

v.

THERRIEN WADDELL, INC., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-4562-11)

(Hon. Michael L. Rankin, Trial Judge)

(Argued September 18, 2014                     Decided March 26, 2015)

*Mickie Bailey* for appellant.

*Leonard A. Sacks*, with whom *Jesse S. Keene* was on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and STEADMAN, *Senior Judge*.

THOMPSON, *Associate Judge*:  After a bench trial, the Superior Court (the Honorable Michael Rankin) entered judgment in favor of appellee Therrien Waddell, Inc. ("TWI"), and against appellant United House of Prayer for All People ("UHP"), requiring UHP to pay damages for what Judge Rankin found to be UHP's breach of a binding and enforceable oral agreement between the parties,

under which TWI was to construct an apartment building (the Bailey Park Apartments) at 625 Rhode Island Avenue, N.W. ("the apartment building"), on a lot owned by UHP.  UHP seeks reversal of the judgment, contending that there was no intent to be bound and no enforceable agreement because the parties never reached a meeting of the minds on several material terms.  Our analysis differs from the trial court's, but we conclude that the evidence and the law support a conclusion that the parties reached an enforceable oral agreement — specifically, a binding preliminary commitment to negotiate in good faith toward a written construction agreement, within the framework the parties had agreed upon during a meeting between their representatives in December 2010. We find it necessary, however, to remand the matter to the trial court (1) for an additional finding as to whether UHP acted in bad faith in declining to negotiate with TWI; and, if so, (2) for the court also to determine whether, absent UHP's bad faith, the parties would have entered into a final construction agreement; and (3) for recomputation of a damages award.

## I.    Background

The following factual background is drawn from Judge Rankin's July 30, 2013, Memorandum Opinion and from the supporting trial testimony and exhibits.[1] In 2009, UHP retained the firm of Suzane Reatig Architecture, PLLC ("SRA") to perform architectural services in connection with the planned apartment building project (the "Project"). SRA principal Suzane Reatig worked with SRA architect Megan Mitchell to prepare a bid solicitation package. The package included a manual (the "Project Manual" or the "Manual") containing the specifications for the building; provided that a standardized contract developed by the American Institute of Architects ("AIA"), known as AIA A-101-2007, would be the form of contract between UHP and the contractor whose bid was selected; and provided that the general conditions for the contract would be as set forth in Articles 1 through 14 of another standardized agreement known as AIA A-201-2007.

SRA distributed the bid solicitation package in late November 2010, and on December 20, 2010, TWI Senior Project Manager Richard Whalen sent SRA

---

[1] We treat the trial court's factual findings as "presumptively correct unless they are clearly erroneous or unsupported by the record." *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005) (internal quotes omitted); *see also Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d 725, 741 (D.C. 2011) ("An appellate court will not reverse trial court findings unless they are clearly erroneous or unsupported by the evidence."). Judge Rankin specifically noted that "[c]redibility of the witnesses was considered in weighing the evidence" and arriving at his factual findings. See *infra* note 9.

TWI's bid. TWI's bid, the lowest of the four bids SRA received, proposed a total price of $4,899,000 (including profit of $141,000, representing 3% of the contract cost excluding the cost of obtaining a performance bond) and "a duration of 9 months" (based on an assumption that the Project would start in January or February of 2011). The "Notes & Clarifications" attached to TWI's bid stated that "[w]hile the basic contract form has been indicated, [TWI] reserve[s] the right to negotiate mutually agreeable terms of the construction agreement if selected for the project."

On December 21, 2010, architect Mitchell invited Whalen to a meeting with SRA and UHP representatives to discuss the Project. The meeting took place on December 22, 2010, and was attended by Whalen and Dan Coffey, a TWI vice-president, representing TWI; by Reatig and Mitchell, representing SRA; and by Apostle Sterling Green, the owner's representative for UHP.

At the December 22, 2010, meeting, there was a "comprehensive" discussion of TWI's proposal and the Project. This included a discussion of the "Notes & Clarifications" that TWI had attached to its bid. The Notes & Clarifications reflected TWI's proposal to "use a less expensive satin finish for the exterior Trespa Meteon façade panels instead of the more expensive metallic finish

called for" in the Project specifications. SRA "insisted that the owner wanted the more expensive metallic finish cost included in the contract[,]" which "meant that the cost of the project would increase." Another major point of discussion at the meeting was the need for a supplementary vapor barrier system: "the architects directed TWI to use a more expensive E.P. Henry product and to include the costs of the system in the contract."[2] The meeting participants also discussed the importance of obtaining Leadership in Energy and Environmental Design ("LEED") certification for the Project. "The project manual specified that the Project should qualify for LEED certification but did not specify which LEED credits would be pursued"; during the meeting, the SRA representatives for the first time "identified . . . the [specific] LEED credits the Project would try to meet[.]" Coffey informed the meeting participants that Whalen "did not have . . . qualifications for the LEED" requirements, and that, instead of Whalen, TWI's

---

[2] Although the Project Manual sent to bidders called for the Henry product, the Manual also invited bidders to "submit additional alternates for consideration by the Owner, by way of proposal variations or value engineering changes." Thus, contrary to UHP's argument, TWI was not required to base its bid on more expensive items as to which they had value-engineering suggestions. This background undercuts UHP's contention that the evidence required Judge Rankin to find that UHP "refused to pay additional money for those items already required to be included in the scope of work as dictated by the Project Manual" and undermines UHP's contention that Judge Rankin "erroneously assumed that [UHP] . . . assented to some sort of price increase" by demanding that "additional items be included in the scope of work."

LEED-accredited project manager Jonathan Fuentes, who had been unable to attend the meeting, would be the Project Manager because of his LEED qualifications.[3] Coffey also told the group that meeting UHP's newly-identified LEED-credit demands "could mean additional time and money." The meeting participants also discussed that "there were certain things that needed to happen pretty quickly . . . , mainly . . . some of the long-lead materials that require special fabrication." The meeting notes reflect that the participants discussed having a pre-construction meeting with subcontractors in late January. Judge Rankin found that "Green told TWI's representatives that the owner expected a 'long-lasting marriage, not a short honeymoon.'"

---

[3] Coffey testified that UHP and SRA "wanted to make sure [TWI] had somebody that was able to assist them [with LEED certification] and help them through that whole process." Per the meeting discussion, TWI "was to make sure [the] project team had . . . somebody that was very familiar with the LEED standards[.]" According to Coffey, the architects were "comforted" that Fuentes would be there to help them through the LEED process. During the discussion of this topic, Green was listening and made no objection. In particular, Green did not stress that Whalen should stay as project manager. Indeed, Green testified that Whalen was introduced to him as "the estimator that had done all of the cost analyses and prepar[ation of] the bid," and did not even recall that Whalen had the title of project manager. He also referred to having been introduced to "Mr. Coffey and Mr. Fuentes" at the December 22 meeting. As far as the record reveals, Green made no objection when TWI sent a draft contract on January 17, 2011, that listed Fuentes as the "Contractor's representative."

Judge Rankin found that "[a]t the conclusion of the [December 22] meeting, all parties — Apostle Green, SRA and TWI — had reached a meeting of the minds on the material terms of the contract" and that "Green directed TWI to prepare a written contract based on [the parties'] discussions."[4]  Judge Rankin further found that "[o]n leaving the meeting [TWI] understood that it had to modify its proposal so that the written contract conformed to the specific requirements of the owner as expressed by Apostle Green and SRA" at the meeting.

In preparing the modifications, TWI prepared a schedule of prices that reflected replacement of the less expensive satin-finished panels with the more expensive metallic-finished ones, added the considerably more expensive Henry vapor barrier system,[5] added allowances for LEED-credit items that had not been included in TWI's original bid (including LEED-required interior bike racks), and added temporary utility costs (which, per the discussion at the December 22 meeting, were to be borne by the general contractor rather than by the owner). These modifications are reflected in the revised "Notes & Clarifications" and

---

[4]  In Coffey's words, at the end of the meeting, TWI was asked to "go ahead and draft the contract for signature [by] the owner" using the required AIA forms.

[5]  Mitchell told Whalen in a post-meeting email on December 30 that Reatig was "pretty insistent on Henry" even though it was a "big item" and, as Whalen put it, a different vapor barrier would be "quite a bit cheaper."

revised pricing information TWI sent to Mitchell by email on January 13, 2011.[6] The modified price document indicated a total price of $5,043,600 (up from the original bid price of $4,899,000). The January 13 submission also increased the time for substantial completion from nine months to 285 days. Gerald Therrien, a principal of TWI, testified that the additional 15 days was "because of a change in one of the LEED provisions that [TWI was] asked to include[.]"

On January 17, 2011, TWI sent SRA a draft of the AIA A-101-2007 Agreement, with an attached schedule showing, *inter alia*, TWI's revised anticipated profit of $146,000. On January 19, 2011, Mitchell, referring to questions from Green that she had discussed with Reatig, forwarded to Whalen a short list of changes to be made to the Notes & Clarifications. TWI made the requested changes. It couriered revised contract documents to SRA on January 25, 2011, in response to an email from Mitchell the same day that directed, "If you can get the original contract couriered over to us today, [Reatig] may be able to get it signed tomorrow as the Bishop [UHP's CEO, Bishop C.M. Bailey] is in and out of town and possibly will be in tomorrow."

---

[6] Judge Rankin found that Green "could not have been surprised by the changes that TWI made following the meeting because he was there participating and heard the architect directing the changes."

In the meantime, in late December 2010 and January 2011, TWI issued letters of intent to subcontractors, and it also exchanged a number of emails with SRA and Green related to the Project: SRA answered a TWI inquiry about standpipes; provided information to TWI about the sprinkler room; exchanged emails with Whalen about the bike racks and the Henry vapor barrier; provided detailed responses to TWI subcontractor requests for information about stair fabrication, fire dampers and gas furnaces; sent UHP's tax exempt number to TWI; promised to send new structural plans for use by TWI's steel subcontractor and metal deck supplier; and corresponded with Fuentes about a list of architectural changes. On January 28, 2011, answering an email from an insurance agent, Green directed the agent to contact Reatig about putting in place a builders' risk policy naming UHP and TWI as the insureds. On January 31, 2011, an email was sent to Fuentes and copied to Reatig, inviting Fuentes to join the LEED project at 625 Rhode Island Avenue as a "Project Team Member" and "Construction Manager." As Judge Rankin found, the emails "reflect[] that the architect and Jonathan Fuentes were working together going forward on the Project." Judge Rankin also found that a series of emails between SRA and TWI "beginning in the days following the meeting and continuing through the end of January . . . is circumstantial evidence showing that all parties, including Apostle Green, were acting on the understanding that UHP and TWI had a contract."

Early February 2011 emails were to the same effect: Mitchell and Fuentes corresponded about uploading design files, changes to structural engineering drawings, structural steel shop drawings (on which Fuentes said TWI was "continuing to work hard"), and the colors for verification samples, and the structural engineer who was working with SRA pronounced as "acceptable" TWI's steel contractor's proposed "connection methods" and directed TWI to submit related calculations. Reatig and Therrien expressed that they were looking forward to working together on the Project, and Reatig promised to remind Green to provide TWI with a confirmation of financing availability. On February 4, Green emailed Therrien, directing him to see "the attached Letter of Financial Good Standing" and on February 10, wrote to Therrien and Coffey to say that Bishop Bailey wanted him to speak with them about their "followup questions."

Handwritten notes from a February 23 coordination meeting between the architects and TWI representatives (including Fuentes and Therrien) indicate that the contract was "being signed." On February 25, Therrien emailed Green to ask about the status of the construction agreement.[7] In a February 28 response to

---

[7] Therrien testified that he had had "several conversations" with Green about the status of the contract, during which Green told him that it was being

(continued…)

Therrien's February 25 email, Green informed Therrien that, "[p]er the objections of our Counsel to a number of the terms and conditions you requested be inserted into the standard AIA Contract . . . [UHP CEO] Bishop C.M. Bailey has declined to enter into this referenced agreement, and will <u>not</u> proceed any further."[8] Therrien testified that, immediately upon receipt of Green's message, he called Green, who rebuffed Therrien's requests to speak with Bailey or UHP's counsel regarding what "terms and conditions" they had found objectionable. Therrien then sent a letter later that day to Bailey, in which he wrote that "[s]ince we were asked to draft this construction agreement and we used a standard AIA form, we are most certainly receptive to discuss any issues or concerns that your attorneys have. . . . The terms of the agreement are open to discussion and any reasonable negotiation." Therrien noted that "no one [had] . . . provided any indication of any significant issue." Bailey declined Therrien's invitation to further discussions,

---

(…continued)
reviewed by UHP's attorneys. Therrien further testified that notwithstanding the lack of an executed contract, "[b]ecause of all the interactions that we were having with the architect, . . . the positive feedback I was getting from Apostle Green, . . . getting the permit, . . . procuring a bond, getting my insurance certificate, . . . and the extent of the work that we were doing, . . . [he] believe[d] that [the parties] essentially had a contract," even if there were "fine . . . legal points" still to be discussed and resolved, "as [TWI] do[es] frequently with many, many owners."

[8] Judge Rankin observed that it appeared that Green "was as surprised as anyone that Bishop Bailey refused to sign the written contract." The court found that both Reatig and Green "expected Bishop Bailey to sign the papers."

writing in a February 28 letter forwarded by Green to Therrien, "I stand by my decision . . . I have declined to enter into this referenced Agreement, and will not proceed any further."

Reatig testified that she changed her mind about recommending TWI for the job because TWI had changed personnel and because she was hearing things from subcontractors and anticipating big change orders. Judge Rankin found this testimony "incredible and without any support in the record."[9] There was no testimony from Bailey or UHP's counsel, and Judge Rankin found that "they are apparently the only people who know why the owner did not sign the contract."[10]

---

[9] More generally, Judge Rankin found both Reatig and Green to be "highly honorable people" who demonstrated "[u]nwavering loyalty to their employer," but not to be credible witnesses. He found that "[u]nwavering loyalty to their employer appears to be the basis for the apparent bias . . . in their testimonies."

[10] What is known is that, on March 4, 2011, just a week after Bailey wrote that he would not proceed further with TWI, McCullough Construction LLC ("McCullough") signed a contract to construct the Bailey Park Apartments. Bailey countersigned that agreement on April 7, 2011. The contract price was $5,073,709 (approximately $30,000 more than TWI's price), and the contract called for completion 390 days from the date of commencement (versus 285 days in the TWI draft contract). McCullough's line item for profit, $235,000, also was higher than TWI's ($146,000).

After Therrien received the response from Bailey, TWI submitted to UHP a request for payment for the services it had already rendered, seeking $75,504.70 for time, materials that TWI had already ordered from various subcontractors, shop drawings and submittals, and related expenses. UHP denied the request.[11] On June 9, 2011, TWI filed a complaint seeking damages for breach of contract or, in the alternative, $75,504.70 under a *quantum meruit* theory.

After a three-day bench trial, Judge Rankin ruled in favor of TWI. He found that the December 22 meeting "result[ed] in the formation of a binding contract . . . that was subsequently reduced to writing and fully enforceable"; that the general terms of the contract were found in the documents included in the Project Manual; that "the nature of the discussion at the meeting and the behavior of the parties afterwards leads to the ineluctable conclusion that the parties understood and agreed to the material terms of price, time, materials and mutual responsibilities and intended to be bound by the agreement"; that the credible evidence "does not support" UHP's claim that the parties "did not intend to be bound until a document was signed"; that TWI did not materially breach the contract "by any changes [it made] . . . between the time it submitted its bid and the submission to UHP of the

---

[11] Green wrote in an email to Therrien that "in the absence of a written and executed construction contract . . . no performance by [TWI], nor any payment to [TWI] in the above matter has been, nor will be, authorized by [UHP]."

draft written contract"; that "[t]he only evidence of changes to the material terms of price, time and cost is the evidence that the owner's team told TWI that the owner wanted additional items in the contract[,]" which "resulted in driving up costs and increasing the time to complete the job"; that there was "no proof of a change to any *material* term that the owner's representative did not demand"; and that in the draft contract drawn up by TWI at Green's direction, there were "neither significant changes . . . nor . . . material terms still to be negotiated." Judge Rankin found UHP liable for damages based on TWI's anticipated profit ($146,000) and the cost of work that had already been performed ("because time was of the essence") before UHP's repudiation of the contract ($75,504.70), for a total of $221,504.70, plus costs and interest. This appeal by UHP followed.

UHP argues that there was no enforceable agreement because the material terms of "price and duration were never fixed or agreed upon during the December 22nd meeting."[12] It argues that this omission of material terms rendered any agreement too "vague and ambiguous" to be enforceable. It asserts that these material terms were made known to UHP only when TWI submitted the draft written contract, to which, UHP argues, it never assented. UHP also argues that

---

[12] At oral argument, UHP's counsel also argued that it was not established who the project manager would be, another term UHP contends was material.

the trial court erred in finding a clear intent to be bound by an oral agreement or written draft contract since the evidence showed that UHP insisted that there be a written contract signed by both parties before the commencement of work and that the terms of any written draft contract be reviewed and approved by its legal counsel prior to its execution of a contact. UHP contends further that it had no reason to know that TWI had commenced any work, "as such was in direct contradiction to the terms of the oral agreement reached by the parties." In the alternative, UHP argues that TWI is not entitled to quantum meruit damages because the parties agreed that certain conditions would be met before the commencement of work on the project, a material term that TWI disregarded and that excuses any obligation UHP had to perform under the alleged contract.[13]

## II. Standard of Review and Applicable Law

---

[13] UHP also argues that the trial court premised its decision on a number of trial exhibits that were not admitted into evidence. However, UHP has not adequately explained how, if at all, anything in the non-admitted exhibits impacted the court's ruling, and it acknowledges that some of the non-admitted exhibits contained information cumulative of information in admitted exhibits. Accordingly, we reach no conclusion on this issue and decline to address it further.

"For an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). "[T]he determination of what the parties consider to be the material terms of their agreement is a question of fact." *Strauss v. NewMarket Global Consulting Grp., LLC,* 5 A.3d 1027, 1033 (D.C. 2010). We may reject that determination and any of the trial court's other findings of fact only if they are "clearly and manifestly wrong" or "without evidence to support them." *Id.* By contrast, "[t]he determination whether an enforceable contract exists . . . is a question of law[,]" *Rosenthal v. National Produce Co., Inc.*, 573 A.2d 365, 369 n.9 (D.C. 1990), which this court reviews *de novo*. *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009).

While agreement as to material terms "is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of a contract." *Kramer Assocs., Inc. v. Ikam, Ltd*., 888 A.2d 247, 252 (D.C. 2005) (internal quotation marks omitted). Rather, "[t]he parties' acts at the time of the making of the contract are also indicative of a meeting of the minds." *Id.* (internal quotation marks omitted). That can be so "[e]ven if the parties intend to subsequently enter into a written contract," because "it does not necessarily follow that they have not made any contract until the writing is completed and

signed." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). "The parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness." *Id.* "Regardless of the parties' actual, subjective intentions, the ultimate issue is whether . . . they objectively manifested a mutual intent to be bound[.]" *Dyer*, 983 A.2d at 357 (internal quotation marks omitted) (emphasis omitted).

"Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." Restatement (Second) of Contracts, § 33 cmt. a (1981) (stating also that "the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon"). It is also "plain that all the terms contemplated by [an] agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy." *V'Soske v. Barwick*, 404 F.2d 495, 500 (2d Cir. 1968). However, an enforceable contract "must be sufficiently definite as to its material terms . . . that the promises and performance to be rendered by each party are reasonably certain[,]" such that "the contract provides a sufficient basis for determining whether a breach has occurred and for identifying an appropriate remedy." *Rosenthal*, 573 A.2d at 370; *accord, Auger v. Tasea Inv. Co.*, 676 A.2d 18, 23 n.6

(D.C. 1996) ("A contract will be unenforceable if its terms are so uncertain that a court cannot accurately assess damages.").

This court has long recognized the principle that if a "document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made[, because] the so-called 'contract' to make a contract is not a contract at all." *Jack Baker*, 664 A.2d at 1239 (quoting Corbin, Contracts § 29 (1963)). More recently, however, we have embraced "the well-known formulation" that establishes that there are "two distinct types" of preliminary agreements that can have "binding force" and that "classifies preliminary agreements as 'Type I' or 'Type II'":

> [A "Type I" agreement] occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form — only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable.
>
> . . .
>
> The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not

necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type — the binding preliminary commitment — does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate [i.e., ultimate] objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

*Stanford Hotels*, 18 A.3d at 735-36 (*quoting Teachers Ins. & Annuity Ass'n v.*

*Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)) (footnote and citation

omitted); *see also Jack Baker*, 664 A.2d at 1239 ("[P]arties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point."); *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 425-26 (8th Cir. 2008) (explaining that while New York courts will not enforce "'a mere agreement to agree,' . . . a New York court may conclude that [the parties] entered into an enforceable 'good-faith contractual obligation to cooperate' in the negotiation of a final agreement"); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 277 (7th Cir. 1996) ("[A]greements to negotiate toward the formation of a contract are themselves enforceable as contracts if the parties intended to be legally bound.").

In cases where the parties have an enforceable agreement to perform under the terms of a contract (such as a Type I agreement), if a breach of contract "consists in preventing performance of the contract, without fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct elements or grounds of damage, namely:  First, what he has already expended toward performance, less the value of materials on hand; secondly, the profits that he would have realized by performing the whole contract."  *Purcell Envelope Co. v. United States*, 51 Ct. Cl. 211, 220 (Ct. Cl. 1916), *aff'd*, 249 U.S. 313 (1919); *see also District of Columbia v. Cranford Paving Co.*, 271 F. 374 (D.C. Cir. 1921)

(affirming award of lost profits to the company where the District, over the company's objection, decided to do a portion of the contracted-for work itself).

The rule may be different, however, where there is a Type II agreement and the breach is a failure to negotiate in good faith. Some courts have held in such cases that "lost profits are not available," but that "out-of-pocket costs incurred in the course of good faith partial performance are appropriate[.]" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (citing *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356, 1361 (N.Y. 1992) (reasoning that "'if no agreement was reached and … it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation'")). Other courts have emphasized, however, that expectancy damages may be allowed "if it can be discerned what agreement would have been reached[.]" *Fairbrook Leasing*, 519 F.3d at 429.[14] Adopting that approach, this court held in *Stanford Hotels* that

---

[14] The *Fairbrook Leasing* court was "not . . . confident . . . that *Goodstein* . . . should be read as categorically precluding benefit-of-the-bargain damages for all breaches of binding preliminary agreements to negotiate a final agreement in good faith" and observed that "[t]his is a difficult, largely unsettled question of remedies." 519 F.3d at 429. However, on the record before it, the court had "no difficulty affirming the district court's decision that expectancy damages may not be recovered in this case . . . because The Term Sheet was silent on significant issues such as the allocation of maintenance costs and the condition of returned aircraft[,]" and thus the amount of profit that could have been expected was not knowable. *Id.* at 430.

the trial court "correctly noted that even though the parties had entered into a preliminary Type II agreement, this may be the rare case in which a remedy based on the anticipated contract [including "expectation damages"] may be appropriate because all the terms of the deal had been agreed upon." 18 A.3d at 739 (internal quotation marks omitted); *see also SIGA Techs., Inc. v. Pharmathene, Inc*., 67 A.3d 330, 350-51 (Del. 2013) ("We now hold that where the parties have a Type II preliminary agreement to negotiate in good faith, and the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the defendant's bad faith negotiations, the plaintiff is entitled to recover contract expectation damages."); *Venture Assocs.*, 96 F.3d at 278 ("Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith . . . if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract[.]"); *JamSports & Entm't, LLC v. Paradama Prods*., 336 F. Supp. 2d 824, 849 (N.D. Ill. 2004) (citing *Venture Assocs.* for the proposition that "lost profits may, in appropriate circumstances, be recovered based on a party's breach of a contractual obligation to negotiate in good faith").

### III. Analysis

UHP contends that the trial court erred in concluding that there was an enforceable construction agreement when the parties had not agreed on several material terms (including, UHP asserts, scope of work, price, duration, and personnel). However, Judge Rankin found that the parties reached agreement on those material terms, and we cannot say that he clearly erred in so finding. To be sure, it was undisputed that, by the end of the December 22 meeting, the scope of work had changed from the work assumed in TWI's initial bid. But the evidence supports Judge Rankin's finding that the parties' representatives left the meeting understanding that TWI was to draft a written contract and accompanying schedules that added the metallic-finished panels, the Henry vapor barriers, and additional LEED items needed to achieve the certification level that SRA prescribed, and that they also understood that Fuentes would be project manager. And, although TWI's overall price changed from the original bid price, the record supports Judge Rankin's finding that the parties understood that the price would increase to cover the cost of the more expensive and additional items that they agreed were to be included in the scope of work. While the parties' understanding that agreed-upon changes would "increase the price and duration" of the contract was not translated into precise figures by the end of the meeting, the costs of the

additional items, the impact of the additional costs on TWI's anticipated profit (3% of costs other than bond costs), the additional time required for the LEED-related work, and the additional temporary utility costs associated with that additional time, were all reasonably ascertainable.[15]

However, we agree with UHP that the parties did not reach an agreement that was sufficiently complete that a final written construction agreement was a mere formality. As described above, in its original bid, TWI "reserve[d] the right to negotiate mutually agreeable terms of the construction agreement if selected for the project." The record supports Judge Rankin's finding that the parties reached agreement as to the "material terms of price, time, materials and mutual responsibilities," but TWI's reservation of the right to negotiate additional unspecified terms meant that there might be additional terms that one or both parties would deem material and as to which no agreement had been reached. As UHP points out, when TWI forwarded the AIA A-201-2007 contract, it added

---

[15] *Cf. Camrex Contractors (Marine), Ltd. v. Reliance Marine Applicators, Inc.*, 579 F. Supp. 1420, 1428-29 (E.D.N.Y. 1984) (reasoning that there was a contract despite open terms because "extrinsic evidence was available to render the new work price reasonably definite" and because the court could "fill the contractual gap by utilizing the factual predicate in the record and by receiving expert testimony on industry price standards" and could "summon[] an expert to fix the industrial standard for comparable work") (internal quotation marks omitted).

"more than two dozen other provisions to its draft contracts which were never discussed during the December 22nd meeting," which did not appear in the standard form document, and which UHP had apparently not seen before.[16] Judge Rankin did not specifically consider whether any of these additional terms was material,[17] and we cannot say as a matter of law that they were not.[18] We conclude that there was no enforceable oral construction agreement; we cannot agree with Judge Rankin's legal conclusion that the parties "behaved as though they intended to be bound by [all] the terms written in the January Draft contract." *See Jack Baker*, 664 A.2d at 1241 (holding that there was no binding oral construction contract where "[t]he form contract sent to [plaintiff by defendant] was a complex

---

[16] As UHP explains in its brief, the AIA forms "are templates wherein the parties are able to insert or change language to reflect the negotiated terms of their specific agreement." Areas where changes or additions have been made are indicated by vertical lines in the left margin of the document.

[17] These included provisions pertaining to the date of commencement, liquidated or consequential damages, progress payments, retainage, the date of final payment, dispute resolution by arbitration, interest on late payments, time for release of liens, provisions related to any "Change in the Work" or suspension of work, liability insurance, Code interpretation, work delays due to adverse weather, and provisions relating to LEED certification. Thus, the record does not fully support Judge Rankin's finding that there was "no proof of a change to any *material* term that the owner's representative did not demand."

[18] We note, for example, that TWI added a provision that "[n]o actual liquidated or consequential damages shall apply" for failure to achieve substantial completion on time. A provision relating to liquidated damages has been held to constitute a "material term[]." *See, e.g.*, *Lumbermens Mut. Cas .Co. v. United States*, 654 F.3d 1305, 1318 (Fed. Cir. 2011).

document [that] included sixteen articles and was ten pages long" and where "some few articles contained typed-in provisions especially relating to this project, and the scope of work and payment schedule were separate attachments, drafted especially for this project").

Nevertheless, on the facts found by the trial court, we conclude that the parties did enter into an enforceable agreement by which they intended to be bound:  specifically, a "'binding preliminary commitment,'" *Stanford Hotels*, 18 A.3d at 735, that obligated both sides to seek to reach a final construction agreement upon the agreed terms by negotiating in good faith to resolve additional terms.  The agreement was preliminary because it "contemplate[d] the preparation and execution of additional documentation," *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008); it was not the case that the parties had "agree[d] on all the points [that] require[d] negotiation[,]" *Id.* at 131, were merely awaiting "memorializ[ation of] their agreement in a more formal document[,]" and were "'fully bound to carry out the terms of the agreement even if the formal instrument [was] never executed.'" *Id*. at 124.  Rather, "'the parties agree[d] on certain major terms, . . . [left] other terms open for further negotiation[,]'" and, we conclude, "'b[ou]nd themselves to negotiate in good faith to work out the terms remaining open.'" *Id*.

UHP asserts that it had no intention to be bound, but Green acknowledged in his testimony (and, as Judge Rankin noted, UHP acknowledged in its Post-Hearing Closing Argument and Legal Memorandum) that UHP "awarded TWI the Project based upon TWI's December 22nd bid."[19]  TWI submitted its original bid on December 20, 2010.  If there was a "December 22 bid," it was the original bid plus the costs of the additional items that SRA, by the end of the December 22 meeting, instructed TWI to add.

If the award of the Project to TWI is not a sufficient objective indication of UHP's intent to be bound, "there is no surer way to find out what parties meant, than to see what they have done."  *Vacold*, 545 F.3d at 123 (internal quotation marks and alterations omitted).  They did a great deal that evinced their mutual intent to be bound.  As described above, Green made repeated efforts to provide TWI with assurance of its UHP's good financial standing and also put UHP's insurance agent in touch with the architects so that the agent could put in place a builder's risk policy that named TWI as one of the insureds for the Project.  TWI

---

[19]  Green testified that, as the owner's representative, he was allowed "to speak for the owner, to make commitments for the owner, [and] to bind the owner."

pressed UHP for financial responsibility and tax exempt information, pursued a bond, and issued letters of intent to its subcontractors and transmitted to SRA their requests for information needed for shop drawings and requests for approval of construction methods and product samples. In the weeks following the December 22 meeting, SRA — which Judge Rankin found was responsible for "awarding the contract to the low bidder" — corresponded with TWI, including both Whalen and Fuentes, about a number of matters that were necessary to move the project forward, and it provided UHP's tax-exempt number[20] and other information that TWI needed only if it was to be the construction contractor for the Project.[21] SRA's structural engineer was "working like crazy" to get to TWI new structural plans that TWI said it needed to deliver to its steel subcontractor and metal deck supplier, and, on January 14, 2011, Mitchell promised to expedite the delivery to TWI because, she said, she knew TWI was "anxious to get the steel going." No evidence was presented about UHP or SRA providing such information or materials to any other prospective contractor.

---

[20] Mitchell testified that she did not provide the tax-exempt number to any other bidder in connection with this Project.

[21] As Judge Rankin found, "[p]ursuant to the A201 General Conditions, the contractor and UHP were required to communicate with each other through SRA on all matters arising out of or relating to the contract and the Project." It appears that Reatig had a particularly close working relationship with UHP, having "worked with UHP on between forty and fifty projects."

At the same time, the parties exchanged drafts of the construction agreement, comments on the drafts, and inquiries or reminders about the status of the contract and suggestions about moving it forward for signature. Mitchell testified that "we were all working towards making this thing happen[.]" As Judge Rankin found, the evidence showed that UHP, the architects and TWI "were all working harmoniously to get the project underway." We discern no basis for disturbing his finding that "[t]he credible evidence does not support [the] view" that the parties did not intend to be bound in any way until a document was signed.

The time, effort, and resources that UHP and its architects and TWI devoted to these various pre-construction matters evidence that each side understood itself to be bound to go forward toward a construction agreement that would enable TWI to commence the work onsite. *Cf. Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 294, 299-300 (3d Cir. 1986) (holding that there was sufficient evidence to support a finding that the parties intended to be bound by their letter of intent to enter into a lease where, after the letter was executed, both parties "initiated procedures directed toward satisfaction of lease contingencies," plaintiff "directed its parent corporation to prepare a draft lease[,]" and plaintiff's representatives took steps to "obtain measurements for architectural alterations,

renovations, and related construction"); *Greene v. Rumsfeld*, 266 F. Supp. 2d 125, 137 (D.D.C. 2003) ("the parties clearly evinced an intent to be bound by the agreement. The parties' counsel described themselves as excited and relieved to have reached agreement"). The time, effort, and resources amounted to "partial performance, [which] cuts strongly in favor of finding" a binding preliminary commitment. *Brown v. Cara*, 420 F.3d 148, 158 (2d Cir. 2005).

Judge Rankin found that "all parties, including Apostle Green, were acting on the understanding that UHP and TWI had a contract." We conclude, more specifically and as a matter of law, that they had an enforceable Type II agreement, and the record supports Judge Rankin's finding that TWI (which, as we have noted, had specifically reserved the right to negotiate mutually agreeable additional terms) did nothing to breach that agreement.[22] On the record that was before him,

---

[22] Judge Rankin found that Green made clear at the December 22 meeting that Bailey "did not want changes in price and did not want the contractor to change the personnel on the contract." UHP argues that the increase from TWI's original bid price and the transition to Fuentes as project manager violated those parameters. However, Judge Rankin credited the evidence that by the end of the December 22 meeting, all participants understood and agreed that the contract price would increase to cover the LEED and other more expensive UHP-demanded items, and also that Fuentes would work on the Project because of his LEED qualifications. Therrien testified that he had three or four conversations with Green after Fuentes was on board, and Green expressed no objection to Fuentes's role.

(continued…)

Judge Rankin could also readily conclude that UHP breached the binding preliminary commitment when it terminated discussions with TWI without offering any explanation of what terms its lawyer purportedly found unacceptable and by declining to negotiate with TWI, or even to discuss the matter with Therrien, even after Therrien indicated to Bailey TWI's receptivity "to discuss any issues or concerns" and told him that the terms of the agreement were open to discussion. *Cf. Brown*, 430 F.3d at 152, 159 (holding that it was error to dismiss suit based on breach of Type II agreement where allegation was that the defendant, "not pleased with the terms described in" plaintiff's proposed construction management agreement, "refused to continue with negotiations and ceased all communication and collaboration with [the plaintiff]"). There was no credited evidence that UHP repudiated the parties' agreement on any basis other than the purported "objections of our Counsel to a number of the terms and conditions you

---

(…continued)

Moreover, while Whalen transferred project management responsibilities to Fuentes, the undisputed evidence was that Whalen was not removed from the Project team. Thus, Green's insistence that "the TWI people who started the job would not change" was satisfied. It is also noteworthy that, as far as the record reveals, when architect Mitchell invited Whalen to a meeting with SRA and UHP representatives to discuss the Project, TWI was not asked or instructed to bring to the meeting everyone who would work on the Project if awarded. Further, following the December 22 meeting, SRA's Mitchell expressed that it was "nice to meet" Fuentes and told him that she "look[ed] forward to getting this project going[.]" We follow the trial court in rejecting UHP's argument that TWI altered the terms of the December 22 agreement by changing its personnel.

requested be inserted into the standard AIA Contract," and, at the same time, no evidence that TWI insisted unalterably on any of the terms it had added in the draft written construction agreement. UHP simply refused to proceed further — and, within a week after announcing its position, had in hand McCullough's signature on a construction agreement. *Cf. Stanford Hotels*, 18 A.3d at 734-35 (observing that the hotel seller "'broke faith'" with its preliminary-agreement obligation "to negotiate exclusively and in good faith with Stanford and to sign a Definitive Agreement if they were able to agree on terms" when it "'abandoned' the negotiations, . . . deceived Stanford as to its real intentions, [and] led Stanford to believe that [it] intended to sell the Hotel when it had already agreed to include the Hotel in a refinancing with a third party").

Had Judge Rankin found that UHP breached the parties' preliminary agreement through bad-faith refusal to negotiate, and had the matter been before him for a decision before the Project had been completed, TWI might have been entitled only to specific performance: an order that UHP negotiate in good faith. *See Stanford Hotels*, 18 A.3d at 739 ("[T]he trial court had authority to grant specific performance of the Preliminary Agreement[.]"); *Brown*, 420 F.3d at 151 ("[W]hile the preliminary agreement is not enforceable as to the ultimate contractual goal contemplated in the document, it is enforceable as an obligation

between the parties to negotiate in good faith within the framework of the agreement."). But since specific performance was no longer an available remedy at the time of trial and decision in 2013, we agree that TWI's remedy for breach would be an award of damages. *See Stanford Hotels*, 18 A.3d at 740 (recognizing that money expectation damages may be an adequate remedy).

Had Judge Rankin found both that UHP breached the parties' preliminary agreement by refusing to negotiate in good faith and that, absent UHP's bad faith, the parties would have entered into a final construction agreement, the record would have permitted the court to award damages based in part on TWI's expectation of earning $146,000 in profit from performing under an executed contract.[23] The parties did not reach agreement on all the terms of a written

---

[23] It is worth observing that the AIA-A-201-2007 General Conditions that were part of UHP's bid solicitation package provided that the contract would be terminable by UHP for its own convenience, and that upon such a termination, the contractor would be "entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead *and profit* on the Work not executed" (italics added). "It would be a paradox to place a lower ceiling on damages for bad faith [refusal to negotiate] than on damages for a perfectly innocent breach[.]" *Venture Assocs. Corp.*, 96 F.3d at 279.

UHP points out that the construction agreement it eventually signed with McCullough "deleted the contractor's right to demand anticipated profits in the event the Owner elects to terminate the agreement for its own convenience." It also sought to introduce exhibits showing that its regular practice was to modify the General Conditions to delete recovery of lost profits upon its election to

(continued…)

construction agreement, but none of the terms that TWI added (to what Judge Rankin aptly referred to as UHP's "*own agreement*") appear to be ones that would have impacted the cost of performance or TWI's entitlement to its anticipated $146,000 base profit amount (which, as we have explained, was calculated as 3% of the contract amount excluding bond costs). See *supra*, note 17. For that reason, this is a case in which lost profit may be an appropriate element of any damages remedy. *See Fairbrook Leasing*, 519 F.3d at 429 (explaining that expectancy damages may be allowed "if it can be discerned what agreement would have been reached"). But, importantly, Judge Rankin did not make an explicit finding as to bad faith, and thus necessarily, did not find that the parties would have entered into a final construction agreement but for UHP's bad faith. Because we are unable to

---

(…continued)
terminate for convenience. But notwithstanding the particular terms of the McCullough contract (and perhaps others), the fact remains that UHP awarded the Project to TWI subject to the standard AIA A201-2007 provision, and, when, SRA relayed Green's comments on the January 17, 2011, draft contract, it did not request any change in the AIA A-201-2007 General Conditions. UHP argues that TWI "cannot now disavow" provisions of the General Conditions document that were incorporated by reference, but attempts to do that itself by distancing itself from the termination-for-convenience provision.

In any event, upon the remand that we conclude is necessary, Judge Rankin will be free to revisit his ruling that the McCullough contract did not "have probative value on what might have been negotiated if there had been further negotiations with these parties [i.e., between UHP and TWI]" (a ruling that UHP asserts was erroneous).

say that the evidence compelled him to so find, we conclude that a remand is necessary to permit the trial court to make findings on these points.

Even without a finding that the parties would have entered into a final construction agreement absent bad faith, upon a finding that UHP's refusal to negotiate was in bad faith, an appropriate measure of damages would also include the out-of-pocket costs TWI incurred in doing preparatory work.[24]  The evidence (including testimony by Coffey) was that "the ability to be able to start very quickly was important" to UHP, that the parties discussed that "certain things [needed] to happen pretty quickly," and that the steel fabrication required for the Project required a lead time of eight to ten weeks.  Thus, the record permitted Judge Rankin to find that here, as in *Brown*, one party (TWI, through its own efforts and those of its subcontractors) "provided extensive and valuable performance within the framework" to which the parties had agreed at the December 22 meeting.[25]  *Id.* at 158.

---

[24]  UHP argues that TWI did not prove its bond costs, but the record indicates that no bond expense was included in TWI's claim on which the compensatory award of $75,504.70 was premised.  We also see no basis for UHP's claim that TWI improperly included in its claim for compensatory damages the costs of "Computer-Aided Design & Drafting" files.

[25]  This is so even though SRA's structural engineer testified that he threw away TWI's shop drawings after he was told to stop working with TWI.  It appears

(continued…)

We have not overlooked UHP's argument that TWI cannot be entitled to reimbursement of the costs it incurred in preparing to perform under the contemplated contract because, UHP claims, the parties agreed at the December 22 meeting that TWI would not commence any work on the Project until there was a fully executed contract, until UHP gave TWI receipt of written notice to proceed, and until required permits were in place and demolition (by UHP) was completed. UHP contends that any performance of work by TWI thus "was in breach of its agreement" with UHP. However, Judge Rankin found that there was no breach by TWI and, on the subject of when work could commence, found that UHP was required to demolish existing structures "[b]efore construction could begin *at the site*" (italics added). That finding is not clearly erroneous. Further, Coffey, whose testimony Judge Rankin appears to have credited, testified that the parties expressed that a building permit "need[ed] to be in place before [TWI] could . . . start work onsite," and that TWI was given authorization at the December 22

_____

(…continued)

to us, however, that the award of costs incurred by TWI in preparing to perform includes an allocated portion of TWI's anticipated profit (specifically, $2,190), which would be duplicative of a portion of any award of lost profits. On remand, any compensatory damages award should be reconsidered and re-computed as appropriate.

meeting to "start . . . preparations," i.e., "to fabricate things, prepare shop drawings, submittals, [and] get those approved in order to do those fabrications."

UHP also notes that the AIA A-201-2007 General Conditions provide that "Work" refers to "the construction and services required by the Contract Documents" and includes "all . . . labor, materials, equipment and services provided or to be provided by the Contractor," making no distinction for preparatory work. UHP then asserts that § 3.1 of the AIA A-101-2007 form contract specifies that "[t]he date of commencement of the Work shall be the date of this [written] Agreement[,]" and it emphasizes that no signed written agreement ever followed. What UHP fails to mention is the clause that follows: "*unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner*." The standard form instructs, "Insert the date of commencement if it differs from the date of this Agreement"; thus, it left the "date of commencement of the Work" an open term. TWI inserted, "The date of commencement shall be the five (5) full Work Days (Monday through Friday – excluding holidays) after receipt of this fully executed agreement, written notice to proceed, all required permits, and completion of demolition scope performed by others." Notably, TWI's insertion did *not* refer to the date of commencement of the (defined term) "Work," and, as noted above, Coffey testified that the parties

agreed that it was *onsite* work that was not to commence until these conditions were satisfied. Thus, the documentary evidence did not compel Judge Rankin to find that the parties agreed that TWI would do no "Work" of any sort before the date of a fully executed contract. Also, while Green and Reatig testified that they did not know that TWI was incurring costs prior to contract execution, Judge Rankin did not credit their testimony. He did credit Coffey's testimony that UHP wanted to commence quickly, that the structural steel requirements necessitated lead time, and that time was of the essence. For all these reasons, we reject UHP's argument that TWI should not in any event be permitted to recover its out-of-pocket costs for preparatory work on the Project.

## IV. Conclusion

For the foregoing reasons, we conclude that the parties were bound by an enforceable agreement to negotiate in good faith toward the signing of a written construction agreement within the framework agreed to at the parties' December 22, 2010, meeting. We remand the matter for additional findings as to whether UHP breached that agreement by refusing to negotiate in good faith and, if so, whether the parties would have reached an agreement but for UHP's bad faith. *See Ross v. Hacienda Coop.*, 686 A.2d 186, 187, 192 (D.C. 1996). The trial court may,

in its discretion, reopen the record for additional evidence. *See id.* at 192. Any award of damages should be determined in a manner consistent with this opinion.


*So ordered.*